153 P.2d 127

REESE v. DEMPSEY, Governor, et al.

No. 4863.

Supreme Court of New Mexico.

Nov. 14, 1944.

Mechem & Hannett, of Albuquerque, and Seth & Montgomery, of Santa Fe, for informant.

C. C. McCulloh, Atty. Gen., Harry L. Bigbee and Robert W. Ward, Asst. Attys. Gen., all of Santa Fe, and Fred E. Wilson, of Albuquerque, for respondents.

MABRY, Justice.

This is an original proceeding based upon petition of Informant, order to show cause and return thereto, in which action Informant George L. Reese, a candidate in the 1944 Democratic primary election for the nomination of Justice of the Supreme Court seeks to compel Respondents, the State Canvassing Board, to perform certain acts in connection with its alleged statutory duties as a canvassing board— as well as duties required of it by a writ of mandamus which heretofore issued and to be hereinafter noticed—which acts and duties, if performed, it is alleged would show him to have received a plurality of the votes as between him, Eugene D. Lujan, the candidate with the next highest number of votes, and Martin A. Threet,

and he would therefore be entitled to the certificate of nomination.

Informant had theretofore been declared the nominee of the party and had earlier, and on October 3rd, been issued the certificate of nomination by the Board after its consideration of the matter of purging, or deducting, from each candidate's total vote certain votes cast by unregistered voters in certain precincts of the state. See Reese v. Dempsey et al., 48 N.M. 417, 152 P.2d 157, recently decided, an original proceeding in mandamus out of which this present action grew.

After the writ of mandamus in Reese v. Dempsey et al., supra, was issued and made absolute, the State Canvassing Board to whom it was directed, met and certified to the several district judges of the counties wherein questioned, or unregistered, votes appeared to the Board to have been cast and included by the precinct election officials in their returns, a list of such unregistered voters; and thereafter proceedings were had in such district courts as is provided by 1941 Comp.Sec. 56-349 (6); and the results of such purging of the votes of such voters as were found by the district judges to be unregistered and not entitled to vote in said primary election, were then certified to Respondents, the Board. Deductions where then by the Board made, from "each candidate for whom such ballots of unregistered voters were cast from the totals shown by the court's findings to have been cast in favor of such candidates." 1941 Comp. Sec. 56-349(6), supra.

These deductions, having been made, some from the vote of Reese and some from that of Lujan, overcame Lujan's lead of seventy-seven votes and resulted in a net gain for Informant of seventy-nine over the number previously shown and calculated by the Board prior to such proceedings, which gave him a plurality of two votes, and Informant was issued the certificate of nomination. Then, based upon its further consideration and canvass of the returns from the several counties of the state as amended by certificates of certain county canvassing boards of the state showing results of the recounts invoked by both Informant and his opponent Eugene D. Lujan, in several precincts · of the State, and acting under the provisions of 1941 Comp.Sec. 56-826, as amended by Chapter 86, § 9, of the Laws of 1943, Lujan, having a plurality of 35 votes, was given the certificate of nomination, the one previously issued to Reese being cancelled.

The particular question here presented is whether the Board performed its full duty, and showed complete obedience to the writ of mandamus which heretofore issued in this suit. The present dispute now arises over the matter of throwing out the entire vote of some six precincts, involving some five-hundred votes, because some forty-three of such voters were unregistered and were not entitled to vote. It appears that there were some six precincts, all in Bernalillo and Sandoval Counties, where, because the ballot num-

bers had not been set down opposite the names of the voters in the poll book and on the official registration affidavits, as required by law, the district judge before whom such question arose could not determine for whom the unregistered and illegal voters in each of these precincts had voted. As to these precincts, the district judge, acting in obedience to the mandate of the statute (Sec. 56-349(6), so certified to Respondents its inability to determine for whom such unregistered voters had voted. It is not the contention that the district judge, in this connection, did not comply with the statute. The charge of error is brought against the Board only. The pertinent portion of the controlling statute as it applies to the immediate question, reads:

"Provided, further, that whenever it appears that the election officials have failed and neglected to set down opposite the names of the voters in the poll book and the official registration affidavits the numbers of the ballots cast by the voters as herein provided, and it further appears that unregistered votes have been cast in such precinct, then and in such event, it shall be the duty of the canvassing board to ignore and fail to include in its canvass the entire election returns from such precinct or election division. * * *" Sec. 56-349(6).

It was found by the district judge that the omission to so set down the ballot numbers was not the result of fraud or intentional negligence with intention to procure the rejection of the vote of any such precincts, but was wholly unintentional.

Informant Reese contends that all the votes of each and all of the six precincts so involved should have been thrown out, ignored, and not included in the Board's canvass of the entire election returns from such precincts or election districts for such office, and that had this been done he would have had a plurality of some Two-hundred eighty-six votes over his opponent, Lujan. The Board declined to so ignore and refuse to include in its canvass the total vote of such precincts, taking the position that, under the law as interpreted by Informant himself at the time he applied for the writ of mandamus involved in the original suit, and as shown by the writ of mandamus, they would not be entitled to so disfranchise so large a number of voters when it could not "change the result of the Supreme Court race."

In interpreting this section of the statute we have heretofore held (Miera v. Martinez, 48 N.M. 30, 145 P.2d 487, 492) that the parenthetical language "Provided said unregistered voters are sufficient in number to change the results," which quoted language appears in this Section 6 before the proviso first above mentioned and which has reference to cases where the ballots of unregistered voters could be identified, must be read into the section as it would apply to such a situation as is now before us, viz., where the ballots

of the unregistered voters of any precinct cannot be identified because of failure to set down the ballot numbers opposite the names of the voters in the poll book, etc.; that it is necessary to so interpret in order not to charge the legislature with an intention to create a situation where "the voters of a precinct are to be disfranchised if their election officials have been honest, though negligent; but, not so, if they have been dishonest and corrupt." To quote more fully from Miera v. Martinez, supra:

"Such is the course of procedure outlined in the statute where the ballots of unregistered voters are easily identifiable by reason of compliance with the statutory requirement for placing the number of the voter's ballot opposite his name in the poll books. The matter is not so simple, however, where either through negligence or design this statutory mandate is not observed. Literally read and given effect, where the election officials through mere negligence have failed to set down opposite the voter's name in the poll books the number of the ballot cast by him, and unregistered votes have been cast, the election officials must 'ignore and fail to include in its canvass the entire election returns from such precinct'; whereas, if the court finds that the omission so to preserve and identify the number of the ballot cast by each voter was 'with intent to procure the rejection of the vote of such precinct', then the court must endeavor to determine from evidence how the unreg-

istered voters cast their ballots, eliminating them from the returns, of course, in the manner hereinabove set forth; and, if it cannot so determine, then a method of elimination by deducting the unregistered votes 'from the several candidates in proportion to the number of legal votes received by such candidates' is provided.

"We say such is the meaning of the statute—'literally read and given effect'—because the parenthetical condition accompanying the first proviso, viz, that the recount is to be sought by the canvassing board only when 'said unregistered voters are sufficient in number to change the result,' is not repeated in the statement of the second proviso. Hence, except as it is to be found there by interpretation as a matter of true legislative intent, as few as two unregistered votes cast in the largest precinct in a county would compel the board to 'ignore and fail to include in its canvass the entire election returns from such precinct', even though they could not possibly change the result as to a single office.

"It seems quite obvious to us that the legislature intended the condition to apply in the one case as well as in the other and that it runs through and qualifies the right to demand a recount by reason of the casting of ballots by unregistered voters, whether or not the ballot numbers are placed opposite the names of such voters. In neither case does the right to request a recount exist in the canvassing board because of the casting of ballots by

unregistered voters unless 'said unregistered voters are sufficient in number to change the results'. If the condition does not modify the provision for recount in cases where the number of the ballot cast is not preserved in the method directed, then we have this absurd result: Where the omission of the election officials to set down in the poll books opposite the name of the voter the number of the ballot cast by him is merely negligent, but not fraudulent, the vote of the entire precinct is excluded from the canvass; whereas, if said omission is found to be fraudulent in the respect indicated, then the vote, determined in the manner specified, is to be included.

"In other words, the voters of a precinct are to be disfranchised if their election officials have been honest, though negligent; but, not so, if they have been dishonest and corrupt. The contestee invokes an application of the statute according to its literal reading, ignoring the condition preceding it in the statute as properly qualifying that meaning. The district court at the recount proceeding thus construed it. We decline to hold the legislature so intended. At least, we must have a language rendering such a construction inescapable before we will so conclude. The language of this sub-paragraph § 56-349 is not of that kind."

The Respondents, as the canvassing board, say they were interpreting the act as this court, in a unanimous opinion written by the Chief Justice, now a member of the Board, itself interpreted it and as they, Respondents, understood the law to be; that they were called upon, after they had examined and properly deducted all of the votes of unregistered voters certified to them by the several district judges, to then throw out the entire vote (some five-hundred in all) of these questioned six precincts only if, and when, it could be made to appear that it would be "sufficient to change the result of said supreme court race"—quoting from the writ of mandamus itself. So, finding at the time, and when they had made the appropriate deductions from the respective candidates' vote, that Informant Reese had a plurality of two votes and was entitled to receive the certificate of nomination on the basis of such returns, they declined to do the useless thing, to throw out and disregard the vote of all the electors, where, out of a total of some five-hundred, only some forty-three had been shown to be unregistered; and when it would not change the "result" of the race in question.

The "result" they were called upon by the writ to deal with, say the Respondents, was not a speculative one, a result that might follow either a recount or a contest, but the result which they, as a canvassing board, were then and there required to determine. Sec. 56-826, as amended. That to add to a candidate's plurality merely by this wholesale disfranchisement of several hundred voters when it is conceded that only some eight

percent of the whole vote of such precincts was illegal, they say, was not required of them and was not within the contemplation of the writ, or the law. We agree with that view.

It is not enough to say, as Informant Reese now contends, that he was entitled to have his total vote so augmented so that in event, upon recount or contest (neither of which remedies could be invoked until the Canvassing Board had first certified a nominee and neither of which was certain to follow), he would need such vote to overcome some wholly speculative result of such recount or contest; that they were not required to speculate as to whether there would be further proceedings, or whether, if such were had, one or the other of the candidates would profit thereby, to thus invoke the extremely penal provision of the statute.

In arriving at the meaning of the term "change the result" and going to the question of interpretation which Informant, himself, placed upon the statute at the time, it is well to notice the language of the writ which issued out of this court upon the petition of Informant and which writ he, or his counsel, prepared. The writ, among other things, contains the following direction and command, to-wit:

" * * * and if it should appear from the certified findings of any Court or Courts to which such referrals may be made that persons other than registered Democrats voted in said primary election and that it cannot be determined for whom such persons voted by reason of the failure of the election officials to record the ballot numbers of the voters in the poll books or on the original affidavits of registration, *and if it further appear* from the official returns, as finally corrected or amended, that the total number of votes of such persons so voting in any such precinct or precincts is *sufficient to change the result of said Supreme Court race, then* it is your duty and obligation to disregard and refuse to canvass the returns from any and all such precincts or election districts, * * * ". (Emphasis ours.)

It would thus appear that Informant, in preparing the writ secured from this court upon his petition, and the Respondents, as a canvassing board, and before any such questions arose in light of subsequent events, all then interpreted the statute in question as requiring that the entire vote of the precincts in question where it could not be determined how the unregistered voters voted should be thrown out only in the event that "the total number of votes of such persons so voting in any such precinct or precincts is sufficient to change the result of said Supreme Court race." The writ, substantially following the statute, after providing for the ordinary purging and deductions where ballot numbers have been preserved opposite the names of the voters, clearly contemplates that such deductions are first to be made. As to the next step, and that one concerned with throwing out the votes of entire precincts, the writ reads:

"And if it *further* appears from the official returns, as finally corrected or amended * * *."

It is not difficult to determine from the language of the writ itself that Respondents, as a canvassing board, were not required to take the drastic action which now, in the light of subsequent events, it is revealed, might be helpful to Informant, when it could not have changed "the result of said Supreme Court race" at the time of the canvass and the issuance of the certificate to Informant.

Respondents urge upon us a consideration of the question whether Informant ever urged upon the Board that they disregard the six precincts in question for the reason it would "change the result." They argue that his present contention that it would change the result is an afterthought. That is to say, it was the contention of Informant when he appeared before the Board at the close of the canvass and when his certificate had been prepared, signed, and laid upon the table for him that the Board should, by the rejection of the votes of such precincts show his total majority over Lujan as would then be reflected. Our attention is called to a portion of Informant's statement read into the record at that time:

"It is my contention that in arriving at the result of the election *in regard to the number or the majority* which the returns show to have been received, the returns from the boxes mentioned in these counties should be disregarded." (Emphasis ours.)

However, the point of whether Informant is now claiming something not presented to or claimed by him in his appearance before the Board we need not decide since another and controlling question determines the dispute.

We should have no difficulty in defining "result" as here used. It is:

"That which results, the conclusion or end to which any course or condition of thing leads, or which is obtained by any process or operation; consequence or effect." Webster's International Dictionary.

"If our proposals once again were heard, we should compel them to a quick *result.*" Milton.

The result contemplated by the statute, as the majority view it, is not a determination of who got exactly how many votes after all unregistered votes possible to be ascertained and deducted are accounted for; but it is controlled by answer to the query: "Who has the plurality of votes and is entitled to the certificate?" Then, if other votes which the statute says must be deducted even if it means the denial of the elective franchise right to hundreds of voters, are challenged, it must first be shown before we would invoke such a harsh and penalizing statute that to do so would "change the result" of the race at the time the Canvassing Board would be first called upon to declare the result and issue its certificate.

■ As to the difference between counting, tabulating, or returning, and declaring the result of an election, see Pritchard et al. v. State ex rel. Barrs, 111 Fla. 122, 149 So. 58, 59, where it is said:

"Election inspectors, as such, have no power to declare the result of an election, even in or for the particular precinct for which they act. Their sole duty is to count, tally, tabulate, and return the votes as they find them to have been cast. The declaration of the result is a duty confided to the canvassing board to which the election returns are required to be sent for the purpose of being canvassed and there having the result declared and announced."

This court, itself, spoke pretty clearly on the subject in Miera v. Martinez, supra, where we said:

"It follows from the views expressed that the only authority residing in the County Canvassing Board to initiate a recount before the district court on account of the casting of unregistered votes is subject to the indispensable condition that 'said unregistered voters are sufficient in number to change the results'. The official returns from the Rodarte Precinct show 114 votes cast for contestant and 62 votes cast for contestee as found by the trial court in the contest. Since contestee's majority in the county as certified by the County Canvassing Board, without the returns from the Rodarte Precinct, was only 16 and contestant's majority in this precinct was 52, it becomes obvious that the total number of unregistered votes cast, if all were in truth unregistered, could not possibly affect the *result* even if each of them be deducted from contestant's majority otherwise existing." (Emphasis ours.)

■ Reluctance of the Courts to permit a wholesale disfranchisement of qualified electors through no fault of their own is reflected by this Court's recent decisions in the cases of Trujillo v. Suazo, 48 N.M. 57, 145 P.2d 871, and Valdez v. Herrera, 48 N.M. 45, 145 P.2d 864. Where any reasonable construction of the statute can be found which will avoid such a result, the Courts should and will favor it.

■ In any event, and if we were not satisfied that the writ carried as full and complete a mandate as the statute itself, as we are, we would be constrained to say Respondents would be entitled, at this late hour and when neither Informant nor his opponent could profit by a longer delay and when the names of the party candidates must be in the hands of the printers perhaps within two or three days of the date (October 21), upon which this case was submitted and argued, to look to, and rely exclusively upon, the writ for the answer to the question presented. The writ will, under the circumstances at least, be looked to as distinguished from the broader query whether Respondents exactly complied with the statute, which, under some circumstances at least, lodges with them some discretion. It was because of the urgency of the situation in respect

to the time element that we announced our decision soon after argument of the case and prior to the writing of the opinion therein.

We do not overlook the able, although as it appears to the majority unpersuasive, additional argument of counsel for Informant. This is to the effect that even if it could be said that Respondents were not called upon to make a complete canvass and to declare the result to be shown after the entire votes of the six precincts had been thrown out because it would appear before this was to be done that Informant already had a plurality of two over his nearest opponent, Lujan, yet, the entire vote of these precincts should be disregarded and not canvassed when, thereafter, and upon recount, it appears that it would then have "changed the result." We say, simply, that the Respondents, in canvassing and at the time they were called upon to determine whether the result would be changed by disfranchising some five-hundred voters, when Informant then had more votes than his opponent and was entitled to the certificate of nomination, acted within the direction and command of the writ certainly; and the statute as well, as we interpret it. And, when we say that the result contemplated is the result appearing at the time of the canvass made in obedience to the writ and not any result to be shown *after* the recount proceedings were had, it necessarily follows that the command of the writ was obeyed.

Other interesting points are raised and relied upon by Respondents in their return and brief, but none of these need be noticed. Likewise, a somewhat different question touching the matter of the vote in one Taos County precinct, in which nine votes are involved, need not be noticed in view of our disposition of the case of the vote in the six precincts of Bernalillo and Sandoval Counties, which is decisive.

The order to show cause should be discharged and the petition dismissed. And, it is so ordered.

WM. J. BARKER and ALBERT R. KOOL, District Judges, concur.

BRICE and BICKLEY, Justices (dissenting).

All seemed agreed in conference that should the provisions of 1941 Comp. 56-349 (6) and other pertinent laws of the State of New Mexico be applied, informant Reese would prevail, but much stress was then laid and now relied upon by the majority upon what this court said in Miera v. Martinez, 48 N.M. 30, 145 P.2d 487 as to the meaning of Sec. 56-349 (6).

The majority also put undue stress upon certain language in the writ of mandamus issued July 7, 1944, to the exclusion of other language used in the writ and to the exclusion of the true intent and meaning of the constitution and laws of the State of New Mexico.

Other language in the alternative writ of mandamus not quoted by the majority

states that the canvassing board "are charged by law * * *, with the obligation and duty of correctly canvassing the returns of said primary election, declaring the results thereof and issuing certificates of nomination to the various candidates appearing upon the official ballots used in said election who, upon said canvass, *are found to have received the highest number of legal votes* in their respective races;" (emphasis ours). The authors of this opinion stated in conference that if there were any confusion in the language of the writ it was not too late for it to be remedied. We asserted that the paramount thing to be decided was as to what the law says the canvassing board must do. We then asserted, and we now reassert, that even mistakes must be corrected in order to achieve the ends specified in the statute and that technicalities must yield to proper disposal of important public questions. The ordinary rules of waiver, estoppel, and invited error, etc., sometimes invoked in private law suits between individuals has no place in a proceeding of this nature where the candidates are not even parties to the proceeding and where the paramount purpose is to determine the results of an election.

With these general principles in view, we embark upon a consideration of the laws of the State of New Mexico.

1941 Comp. Sec. 56-349 (6) is as follows:

"The original affidavits of registration, constituting the official registration list and record in the office of the county clerk, together with all affidavits, applications and orders of court modifying the same in the office of the county clerk may, in any county canvass, be considered a part of the official election returns. Whenever it appears, in any county canvass, from a comparison of such records in said county with the poll books from any precinct or election division, or in any state canvass, by a comparison of the certified index of registered electors, as filed in the office of the secretary of state, with the poll books from any precinct or election division, that ballots have been cast by persons who are not registered and have been included by the precinct election officials in their returns, it shall be the duty of the canvassing board, state or county, as the case may be, before declaring the results of the election (provided said unregistered voters are sufficient in number to change the results), to refer the matter to the district court of the county in which the precinct where such unregistered votes were cast is located, and the district court in the presence of the chairman of the two (2) dominant political parties, and such counsel as they may employ, shall forthwith proceed to hear and determine whether such votes were in fact registered or not. After the court has determined the number and names of the voters who voted without being registered, the court shall, in the presence of the chairman of the two (2) dominant political parties and such counsel as they may employ, open the ballot box of

such precinct and examine the ballots cast by such unregistered voters or persons and determine for which candidates such ballots were cast, and certify the results of the court's findings to said canvassing board, and it shall thereupon become the duty of the canvassing board, and the canvassing board shall deduct from each candidate for whom such ballots of unregistered voters were cast from the totals shown by the court's findings to have been cast in favor of such candidates. Provided, further, that whenever it appears that the election officials have failed and neglected to set down opposite the names of the voters in the poll book and the official registration affidavits the numbers of the ballots cast by the voters as herein provided, and it further appears that unregistered votes have been cast in such precinct, then and in such event, it shall be the duty of the canvassing board to ignore and fail to include in its canvass the entire election returns from such precinct or election division. Provided that where any election board omits to set down opposite the names of the voters in the poll books and the official registration affidavits the numbers of the ballots cast by the voters, with intent to procure the rejection of the vote of such precinct or election division, and the court before whom such matter is heard shall make such finding, then and in such event, if the court can not determine from evidence how said nonregistered voters voted, the number of nonregistered votes shall be deducted from the several candidates in proportion to the number of legal

votes received by such candidates in such precinct or election division, and the court shall certify the result of the court's findings in that regard to said canvassing board and the canvassing board shall deduct from each candidate the number of votes of such unregistered voters as has been determined by the court to be deducted."

The parenthetical language in the foregoing statute "(provided said unregistered voters are sufficient in number to change the results)" is for the guidance of the canvassing board and it is a jurisdictional fact which must be determined by the canvassing board before it can decide whether it will "refer the matter to the district court of the county in which the precinct where such unregistered votes were cast is located." There are several things to be noticed about this parenthetical statement. The first is that it is the "unregistered voters" who are in sufficient number to change the result. There are no directions that the question of whether to refer or not to refer the matter to the district courts is dependent in any way upon for which candidates such unregistered voters cast their ballots. And, further, there is not the slightest indication that whether the board shall decide to refer or not to refer in any way depends upon the number of votes cast for the candidates respectively in precincts where there are unregistered votes and it cannot be ascertained for whom unregistered voters voted because the election officials had failed and neglected to set down opposite the names of

the voters in the poll books and the official registration affidavits the number of the ballots cast by the voters.

The next thing to be noticed carefully about the parenthetical language heretofore quoted is that it is addressed to the board for their consideration *prior* to the referrals to the district courts. The consequences of the referrals cannot of course be known to the board when they are called upon to decide whether it is their duty to make such referrals and it follows necessarily that the board in ascertaining whether it appears that there are unregistered votes in sufficient number to change the result previously arrived at, it must be assumed that *all* of the apparently unregistered voters voted for the candidate who had the highest number of votes according to the result previously obtained. See Montoya v. Ortiz, 24 N.M. 616, 175 P. 335; Miera v. Martinez, 48 N.M. 30, 145 P.2d 487; 18 Am.Jur.Elections, Sec. 259 and Sec. 260.

This parenthetical language "(provided said unregistered voters are sufficient in number to change the results)" does not again appear in the controlling section of the statute. It has spent its force when the board has made its referrals, and is not thereafter to be employed. Thereafter, and as a result of the referrals, new calculations and computations must be made and new results declared. It may be that the ultimate result may or may not be changed. But the parenthetical formula does not again enter the picture and has no place in the machinery of obtaining a new result. Any new result which may occur after the referrals and after the findings of fact have been made by the district courts, and certification made thereof to the canvassing board, and the application by the canvassing board of the court's findings, follows automatically and as a matter of course. The statute is plain and unambiguous as to what is to be done by the canvassing board *after* the district courts have certified back to the board the consequences of the referrals. The board is required to deduct from each candidate for whom such ballots of unregistered voters were cast from the totals shown to have been cast for such candidates, and they shall *also* ignore and fail to include in its canvass the entire election returns from precincts in which unregistered votes were cast where the court has found that unregistered votes referred were "in fact" unregistered, but it is impossible to determine for which candidate such unregistered voters voted because of the conditions mentioned in the first proviso.

Nothing is said here about a change of results, and the performance of this duty is not made to depend upon a change of results in the sense of whether ignoring the election returns from such precinct would result in the election or nomination of a particular candidate.

It is conceivable that each of two candidates for the same office might have received an equal number of votes in such precincts, or it is possible that one candi-

date could suffer a loss by the elimination of one precinct but that this loss would be neutralized by gains accruing from the elimination of another precinct. Or a candidate might suffer a loss by the elimination of the returns of a precinct or several precincts and the loss be overcome by the consequences of other findings certified by the court or courts under other portions of the directives contained in 56-349 (6).

There is no direction as to whether the canvassing board shall first "ignore and fail to include" in its canvass the precincts as required in the first proviso, or to first make deductions required to be made as a consequence of other findings of the court.

Under each or both directives former figures and computations made by the canvassing board will likely be changed. Whether the deductions and eliminations will give the plurality to a candidate who did not have it before may not necessarily follow, and whether it does so follow or not is of no concern to the board.

They must do what the statute says they must do, letting the chips fall where they may, and the displacement or not of a head man will take care of itself *ex necessitate*.

Since the board is required to do these things "before declaring the result of the election," it follows necessarily that they may not declare a result after having done a part of them only.

And, it is no concern of the court's as to whether the legislature has chosen a cor-rect solution for a difficult problem. The one chosen is not novel.

In 18 Am.Jur.Elections, Sec. 260 in the article on "Ascertainment Of Result Of Election," it is said:

"Reception of Illegal Votes.—As a general rule the result of an election must be determined solely by the ballots received according to law. Various theories have been suggested as to the effect on an election of the reception of illegal votes. One is that it invalidates every election in which the vote of the precinct is to be counted; *another is that it annuls the vote of the precinct in which it occurs:* and a third is that it affects only such elections as would be turned one way or the other *by counting the excessive votes in favor of one or another candidate."* (Emphasis supplied.)

Our legislature has selected the theory mentioned above that the reception of unregistered voters "annuls the vote of the precinct in which it occurs" under circumstances described in the first proviso in the election code, Sec. 56-349 (6).

The number of unregistered votes cast in a precinct might be small in number, but on the other hand it might be large in number.

If we become emotionally concerned as to the possibility that some registered voters of a precinct might be disfranchised by following the statute, we might overlook the fact that many thousands of honest electors in a close race might be disfranchised by failure to follow it.

Doubtless an evil sought to be remedied was that of ballot box stuffing with ballots of unregistered voters. The legislature formulated what it thought was a good procedure to cure this evil. The fact that it might work imperfectly in some instances is not to condemn it. Statutes as rules of conduct in public affairs may often put some restraints or deprivations upon the unoffending in order to punish offenders or render their offenses innocuous or unprofitable. Many illustrations of this working principle come to mind. "The greatest good to the greatest number" is about all that can be hoped to be accomplished by statutes regulating public affairs.

Perhaps the legislature thought it would be better that a few unoffending electors in a few precincts be disfranchised in order to cure an evil than that the will of the otherwise majority of electors in a county or the state should be thwarted. The legislature knew that election precincts are the smallest units in the machinery of conducting elections. They knew also how the precinct election officials are selected. Speaking broadly, they are selected by the county commissioners from lists of names supplied by political party organizations. Perhaps the legislature thought that if political party chairman learned in the hard way that it is unprofitable to secure the appointment of incompetent, careless or designing persons as precinct election officials, the practice would soon stop and we would presently not be confronted with

ignorance, inattention, negligence or fraudulent practices which gives rise to the inability to identify the voters by corresponding ballot numbers so that the courts will be able to find out for which candidates the ballots of unregistered voters were cast. Also, reproaches thus administered would stimulate precinct election officials to the exercise of a greater degree of care.

The requirement that the election officials set down opposite the names of the voters in the poll books and the official registration affidavits the number of the ballots cast by the voters has other and far reaching objects of equal importance in securing the "purity of elections" and to "guard against the abuse of elective franchise" as the legislature is required to do under the provisions of Sec. 1 of Art. 7 of our Constitution. It is one of the most important of the requirements of the election code. Upon its observance or non-observance will depend future proceedings to ferret out various kinds of frauds against the purity of elections and against abuses of the elective franchise, not only the voting by unregistered voters but voting by those who are not eligible to vote who may have fraudulently registered. It will not do any good to establish in court that a voter voted fraudulently unless his ballot can be traced and thrown out. Considering its importance, we should hesitate to say that the penalty for its non-observance is too harsh—and even if too harsh its relaxation belongs to the legislature and not to the courts.

In Orchard v. Board of Com'rs of Sierra County, 42 N.M. 172, 76 P.2d 41, 51, we approved the doctrine that:

"The legislature, may, however, expressly provide that certain omissions shall invalidate the vote, in which event no alternative is left to the court."

The majority seem to think that Miera v. Martinez, supra, decided to the contrary of the views heretofore expressed. We do not think so. A careful reading of that case will disclose strong support for the position we here take. There was some language in the opinion which indicated that the court would be reluctant to apply the provisions of the first proviso in 56-349(6) except in a case which necessarily demanded its application and the court went on to say that the facts in that case did not require the application of the provisions of said proviso for several important reasons, the most convincing and cogent of which was as follows [48 N.M. 30, 145 P.2d 492]:

"It follows from the views expressed that the only authority residing in the County Canvassing Board *to initiate a recount before the district court* on account of the casting of unregistered votes is subject to the indispensable condition that 'said unregistered voters are sufficient in number to change the results.' The official returns from the Rodarte Precinct show 114 votes cast for contestant and 62 votes cast for contestee as found by the trial court in the contest. Since contestee's majority in the county as certified by the County Canvassing Board, without the returns from the Rodarte Precinct, was only 16 and contestant's majority in this precinct was 52, it becomes obvious that the total number of *unregistered votes* cast, if all were in truth unregistered, could not possibly affect the result *even if each of them be deducted from contestant's majority otherwise existing.*" (Emphasis supplied.)

It is important to notice that all the way through the opinion the question which is emphasized is whether the referrals under 56-349(6) (inadvertently called "recount") had been properly *initiated*. It was decided that the factor which determined the answer to this question was whether it appears that the number of *unregistered votes* were sufficient to change the result, *not* whether if *all* the votes cast in the offensive precincts were eliminated the result would be changed. There is not the slightest indication that the application of the statute depends upon whether the results of an elimination of the offensive precincts would change the result.

It does not seem reasonable to suppose that we would have reached the decision announced in Miera v. Martinez unless we entertained the view also that *if* the "indispensable condition" that "said unregistered voters are sufficient in number to change the result," had in fact existed, the county canvassing board *would* have had authority to initiate the referrals mentioned in 56-349(6). There is not the slightest expression of opinion in that case

as to what is the course of proceedings to be taken *after* the referrals have been had and the findings of the district court come back to the canvassing board. All the way through the opinion in Miera v. Martinez, supra, various reasons were given in support of our conclusion that "The trial court correctly held that it was not bound by the proceedings initiated by the County Canvassing Board before the district court under the provisions of 1941 Comp. § 56-349(6)", and as stated above, the most potent of the reasons we gave was that "the indispensable condition" to initiation of referrals under 56-349(6), was absent.

No such question arises in the case at bar. The alternative writ of mandamus directed to the board and issued on July 7, 1944, was based upon a petition which alleged that there were a large number of unregistered votes cast in the primary election for Justice of the Supreme Court and more than sufficient to change the result of such primary election. It was represented that some 800 or more unregistered voters had voted. This number was reduced by the board but still a large number left.

The position taken by the respondents at that time was *not* that there did not exist unregistered votes in sufficient number to change the results, but their position was that Sec. 56-349(6) was not applicable to said primary election and they "announced and ruled that in making its canvass, they had not and would not compare any certified lists of the registered electors, filed with the Secretary of State by the County Clerks of any of the Counties of the State of New Mexico, with any of the poll books certified by the precinct election officials of the various precincts and election districts in said State in said primary election, and filed with the said Secretary of State for the purpose of determining whether or not it appeared from said comparison that persons other than registered Democrats had voted and whether said votes were included in the returns of said primary election in sufficient numbers to change the results thereof in the race for the nomination for Democratic candidate for Justice of the Supreme Court."

In the alternative writ of mandamus directed to the board, we answered the foregoing contention of the board as follows:

"That it is your duty and obligation, as such Board, under the provisions of Sections 56-349, 56-358, 56-813 and 56-815 as amended, New Mexico Statutes Annotated, 1941 Compilation, and other laws of the State of New Mexico, to compare said certified indexes or lists with the poll books certified by the precinct election officials as having been used in said primary election and on file in the office of the Secretary of State, for the purpose of determining whether or not it appears from such comparison that persons other than registered Democrats voted in said primary election in any precinct or election district, and whether or not votes of persons other than registered Democrats are included in the election returns from any,

some, or all of the precincts or election districts in sufficient number to change the result of the race for the Democratic nomination for Justice of the Supreme Court, as such result might otherwise appear from the official returns;" and further, as quoted in the majority opinion.

Later the alternative writ of mandamus was made absolute and the referrals were made to the district courts in accordance with said writs. It is assumed and never has been questioned that after the alternative writ was made absolute, the board found the "indispensable condition" that it appeared to the canvassing board that there were unregistered votes sufficient in number to change the results. It thus appears that the question decided in Miera v. Martinez, supra, to wit, whether the referrals to the district courts were properly initiated has not been an issue in the case at bar, at least since the alternative writ of mandamus was made absolute.

So, it clearly appears that what was decided in Miera v. Martinez lends no support to the majority decision.

What we have said demonstrates that the respondents proceeded improperly in the manner described in the majority opinion, but it will not be amiss to show that having gotten off on the wrong track and applied a false theory, they did not follow it through to a logical and correct conclusion.

For the convenience of the reader we recapitulate by saying that the referrals were duly authorized by the board, and the district courts complied with the statute and made such findings as would call for the application of the first proviso in Sec. 56-349(6).

The board announced that from earlier work and at the point when they were called upon to decide what to do about the 6 precincts in Bernalillo County and Sandoval County, Reese had 12,165 votes and Lujan 12,163, and it appeared that Reese thus had a plurality of two votes.

Reese contended that all the votes of each and all of the 6 offending precincts should be ignored and not included in the board's canvass of the election returns for the office of Supreme Court, and that had that been done he would have a plurality of some 286 votes over Lujan.

The board denied the contention of Reese and took the position that "to ignore and fail to include" in its canvass the election returns of such precincts would not "change the results of the election."

In order to reach this conclusion the board must first have in their minds rewritten the parenthetical language heretofore referred to, to wit, "(provided said unregistered voters are sufficient in number to change the results)" and then imported their version into the first proviso so that the proviso as amended by the board would read that in the event the conditions existed as described in such proviso: "it shall be the duty of the canvassing board to ignore and fail to include in its canvass the en-

tire election returns from such precinct or election division (provided the ignoring and failure to include in its canvass the entire election returns from such precinct or election division will change the results)."

The board thus changed the phrase "unregistered voters" to read "precinct or election division returns."

They not only rewrote the parenthetical clause but they gave it a new and an additional time for operation.

Such amendment of the statute by a canvassing board, or by a court, is entirely unwarranted and without authority, and finds no support in Miera v. Martinez, supra.

Perhaps we should leave the matter here, but we intend to show that not only did the board (with the approval of the majority) adopt a theory foreign to the statute, but that they failed to apply even this false theory in such a manner that it would accomplish a paramount mandate of this court that the board should *correctly* canvass "the returns of said primary election, declaring the results thereof, and issuing certificates of nomination to the various candidates appearing upon the official ballots used in said election who, upon said canvass, are found to have received the highest number of *legal* votes in their respective races."

Subsequent discussion will show that the board applied their own erroneous test of "change of results" at the wrong time and to *results* which were not final.

Art. 5, Sec. 2, of the Constitution requires of the state canvassing board to do three things which are pertinent to our inquiry:

(a)  To canvass the returns.

(b)  Declare the results of the election.

(c)  To declare which candidate was elected.

It is idle to say that (b) and (c) are the same thing. The Constitution makers are to be credited with a conscious purpose in requiring the two separate and distinct declarations. That they are not the same thing is demonstrated in Bonacker v. Chuckrow, 166 Misc. 171, 2 N.Y.S.2d 265, 269. It appears in that case that the controlling statute required the board to declare (a) the whole number of votes cast for all of the candidates for each office; (b) the number of votes cast for each candidate; (c) which person was elected to each office. The court went on to say:

"The statute further provides that the persons having the greatest number of votes for each office to be filled by the supervisor districts shall be duly elected to such offices. These determinations and declarations by the board become the official record of the title to the office and no 'certificate of election' is required to perfect that title. The record of the canvass in the second supervisor district is as follows: 'The number of votes cast for supervisor of the second district for Benjamin Carson

was 1,237 and 8 by the Socialist Party, for Fred Bonacker 1,343 giving Fred Bonacker a majority of 98, *pending the investigation of the voting machine in the first district* of the sixth ward.' (Emphasis supplied.)

"This canvass constitutes an equivocal and conditional statement of the number of votes cast for each candidate. It does not 'determine and declare' the number of votes cast, except with a reservation which seems to me to destroy the determination. Particularly, the board does not determine and declare which person was elected to the office. That determination and declaration may be said to follow from the figures as canvassed but it is the duty of the board of canvassers, nevertheless, to make the declaration of election and I think the record title to the office cannot be deemed perfected until the number of votes has been made unequivocal and the declaration of the person elected has been made."

So, we say that for the board to issue a certificate of nomination to Mr. Reese on October 3, 1944, upon the basis of a partial canvass was of no value as a starting point for the purpose of making further computations which might be necessary arising from recounts. The purpose served by the certificate of nomination of October 3 was to start the period of limitations within which recounts could be demanded and nothing more. The announcement made by the board October 3, 1944, that after making the deductions according to a *part* of the findings of the district

courts as a result of the referrals to them under the provisions of 56-349(6) that Lujan had 12,163 and Reese had 12,165 could not have been a declaration of "the result of the election" for the reason that the board could not declare a result of the election until it had completed its canvass and the canvass could not be completed until the result of the recounts yet to be had were made known to the board.

It is doubtless true that in the course of the canvass of the returns that many computations would be made and many tentative results arrived at through the changes effected by the correction of the returns through the various methods mentioned in the election code and the primary code, but if deductions are to be made or precinct returns are to be ignored under circumstances described in 56-349(6) (as construed by the board), or deductions are not to be made accordingly as the "results" would be changed, then manifestly the results referred to must be results which have been attained after everything has been done which could be done under the election codes except the application of the procedures mentioned in 56-349(6), (as construed by the board).

In fact, if the application of the purging procedures mentioned in 56-349(6), as construed and applied by the respondents, are dependent upon their effect upon the results of the election, then such application would be premature in a primary election until the results had been arrived at from a recanvass of the returns "as amended by

such recount" or until the time for recount had expired by limitations. And this is doubtless so even as to initiating the referrals to the district courts as provided in said sub-section.

As to primary elections, the canvass or recanvass of the returns from the several counties as amended by such recounts, seems to be the last step in the canvass and immediately precedes the performance of "the duty of the state canvassing board to issue its certificate of nomination as to all offices other than county or precinct offices in accordance with the result of said recount." 1941 Comp. Sec. 56-826, as amended 1943, Ch. 86, Sec. 9. So, it would seem that if the purging proceedings are to be interjected at a given period of time, that is the time to interject them because that is the first *result* which has achieved any aspects of permanency and finality and which will result in the issuance of the second and final "certificate of nomination," unless the board heeds the admonition of 56-349(6) to refrain from "declaring the results of the election" if the conditions appear as described in said section. If in the instant case these purging proceedings were prematurely initiated that would be no excuse for failing to employ the consequences arising therefrom at the appropriate time. After all, as we said in Orchard v. Board of Com'rs of Sierra County, 42 N.M. 172, 76 P.2d 41, 51, the object of election machinery is "to insure the conduct of the election in such manner in point of form that the true number of legal votes can be ascertained with certainty" and to carry into effect in the case of a primary election the legislative mandate that:

"The person receiving the highest number of votes of his party at such primary for any office shall be the nominee of his party for such office." 1941 Comp. Sec. 56-815.

No technicalities of procedure should stand in the way of obedience to that mandate.

As to what is meant by the "result of an election", the informant in his brief says as follows:

" 'The result of an election usually means the expression of the voters as determined by the counting of ballots.' Cipowski v. Calumet City [322 Ill. 575], 153 N.E. 613, at page 614.

"The 'results' of an election as used throughout the election code refers exclusively to the number of votes received by the respective candidates, i.e. Section 56-340, 1941 Compilation, prescribes the manner in which precinct election officials shall count and talley the ballots and 'certify the result.' Subdivision (b) of this section provides that in precincts where there are no counting judges:

" '* * * the judges of election shall then proceed to count and tally the ballots and certify the result of the election on the form on inside of back cover of poll books setting opposite the name of each candidate in words and figures the total number of

votes cast for him and setting forth in the spaces provided therefor the total number of votes cast for or against each constitutional amendment and other question.'"

There would doubtless have been no confusion in the minds of respondents under the provisions of 1941 Comp. 56-826 pertaining to recounts in primary elections as originally enacted because it is therein provided that the state canvassing board shall issue its certificate of nomination "in accordance with the result of said recount." That was the first and only time that any certificate of nomination could be issued. However, that section was amended by the 1943 legislature, Ch. 86, Sec. 9, so as to provide that a candidate for a state office considering himself aggrieved might within 10 days after the issuance of the certificate of nomination petition for a recount, whereas the former enactment had provided that the petition for recount must be made within 10 days after the election. This introduced some confusion into the section because the language of the section as originally enacted provides as follows: "It shall be the duty of the state canvassing board to issue its certificate of nomination as to all offices other than county or precinct offices *in accordance with the result of said recount."* (Emphasis supplied.) *was left unchanged.* The result necessarily is that the certificate of nomination mentioned in the amendment as fixing the point of time from which the limitations on petitions for recount would run must be regarded as a temporary certificate. This is emphasized by the fact that the last paragraph of 56-826 which was reenacted in Ch. 86, L.1943, Sec. 9, provides that it shall be the duty of the state canvassing board to remain in session, adjourning from day to day, until the returns from the recounts are before it and that "such state canvassing board shall certify the result as shown by the returns from the several counties *as amended by such recount."* (Emphasis supplied.)

There is an important difference between the situation in Miera v. Martinez, supra, and the case at bar. In that case had the entire number of votes alleged to have been unregistered been deducted from the apparently successful candidate's majority, as if they had all voted for such successful candidate, the result would not have been changed.

After the recount Lujan, as the apparently successful candidate, had a plurality of 35 votes. If the challenged precincts in which the courts found 62 unregistered voters to have voted and that the records were such that the court could not ascertain for which candidate the unregistered voters had voted, had by the canvassing board been ignored and not included in its canvass of the returns, "the result as shown by the returns from the several counties as amended by such recount" (1941 Comp. 56-826, as amended in 1943) would have been changed so that Reese would have had a very substantial plurality (about 286). But that is not all. If that method were not followed, then what is to be done about the 62 unregistered votes which were cast

for a candidate or candidates for the Supreme Court as appears in the findings of the district courts? These 62 unregistered votes have been counted and canvassed for some candidate or candidates for Justice of the Supreme Court and they are included in the final result of 35 majority for Lujan. What is to be done about it?

With Lujan having a plurality of 35 after the recounts, if the 62 unregistered votes found by the district courts had been deducted from Lujan's plurality, Reese would have achieved a plurality of 27. If the 19 in Taos county be disregarded, Reese would still have a plurality of 8.

Let it be understood that we do not condone the illogical and uwarranted procedures adopted by the canvassing board, but we assert that they failed to follow any method which would accomplish the paramount purpose of the law and as declared in the writ of mandamus, to wit, to find out who "received the highest number of legal votes in their respective races."

In conclusion we adhere to the views we approved in Orchard v. Board of Com'rs of Sierra County, supra, as follows: "The legislature, may, however, expressly provide that certain omissions shall invalidate the vote, in which event no alternative is left to the court. In the absence of such express provision it has been well pointed out in reference to the various duties imposed on election officers that their great objects are to afford to every citizen having a constitutional right to vote an opportunity to exercise that right to prevent those not so entitled from voting, and to insure the conduct of the election in such manner in point of form that the true number of legal votes' can be ascertained with certainty."

So here, the legislature having provided that certain omissions shall invalidate the precinct vote, there is no alternative to the courts. The whole election machinery is designed as there said to afford those entitled to vote an opportunity to do so and to prevent those not entitled from voting and it is not the province of the court to thwart such preventative measures. For the reasons stated, we dissent.