Ed WILLIS, Candidate for the Office of State Senator, District F, Appellant,

v.

Lowell THOMAS, Jr., former Lieutenant Governor of the State of Alaska, and Terry Miller, Lieutenant Governor of the State of Alaska, Appellees,

and

Tim Kelly, Appellee and Cross-Appellant.

No. 4398.

Supreme Court of Alaska.

Sept. 14, 1979.

Douglas Pope, Anchorage, for appellant Willis.

Clifford J. Groh, Groh, Eggers, Robinson, Price & Johnson, Michael R. Spaan, Birch, Horton, Bittner & Monroe and Patrick H. Owen, Anchorage, for appellee and cross-appellant Kelly.

J. Amy Stephson, Asst. Atty. Gen., Anchorage, Rodger Pegues, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellees Thomas and Miller.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

MATTHEWS, Justice.

This case arises out of the election for the state senate seat in Senate District F which was held on November 7, 1978. After the original canvass of votes in the district the vote tallies showed that candidate Ed Willis had received 4,413 votes and that candidate Tim Kelly had received 4,409 votes. Both candidates requested a recount pursuant to AS 15.20.430.[1] The recount took place on December 1 and 2, 1978, and resulted in a finding that Kelly had received 4,437 votes while Willis had received 4,432 votes. Willis subsequently filed this appeal pursuant to AS 15.20.510.[2]

---

1. AS 15.20.430 provides in pertinent part:

 *Authorization of recount application.*

 (a) A defeated candidate or 10 qualified voters who believe there has been a mistake made by an election official or by the canvassing board in counting the votes in an election, may file an application within five days after the completion of the state canvass to the lieutenant governor for a recount of the votes from any particular precinct or any election district and for any particular office, proposition, or question.

2. AS 15.20.510 provides:

 *Provision for appeal to courts.* A candidate or any person who requested a recount who has reason to believe an error has been made in the recount (1) involving any question or proposition or the validity of any ballot may appeal to the superior court in accordance with applicable court rules governing appeals in civil matters, and (2) involving candidates for the legislature or Con-

gress or the office of governor and lieutenant governor may appeal to the supreme court in accordance with rules as may be promulgated by the court. Appeal shall be filed within five days of the completion of the recount. Upon order of the court, the lieutenant governor shall furnish the record of the recount taken including all ballots, registers, and other election material and papers pertaining to the election contest. The appeal shall be heard by the court sitting without a jury. The inquiry in the appeal shall extend to the questions whether or not the lieutenant governor has properly determined what ballots, parts of ballots, or marks for candidates on ballots are valid, and to which candidate or division on the question or proposition the vote should be attributed. The court shall enter judgment either setting aside, modifying, or affirming the action of the lieutenant governor on recount.

Kelly filed a cross-appeal.

Superior Court Judge J. Justin Ripley was appointed as special master to hear evidence and arguments in the case. On January 11, 1979, the special master issued his report recommending that, with one minor exception which would not change the results of the election, the decisions of the Lieutenant Governor in conducting the recount should be affirmed. On January 12, 1979, this court issued an order affirming the Lieutenant Governor's certification of Tim Kelly as winner of the election. We stated then that an opinion would follow.

A preliminary question has been raised with respect to this court's scope of review in a recount appeal. AS 15.20.510 provides for a direct appeal of recount decisions to the supreme court.[3] AS 15.20.540 provides for a contest of the election as a whole, rather than just the recount.[4] An election contest is heard in the first instance by the superior court. Because neither statute specifies exactly what the difference between the two actions is, appellant Willis filed both an election contest in the superior court under AS 15.20.540 and a direct appeal of the recount to this court under AS 15.20.510. The election contest case was consolidated with this direct appeal before Judge Ripley. Cross-appellant Kelly argued before the special master that many of the issues raised in Willis' recount appeal could properly be raised only in the election contest. Kelly's position in essence was that under AS 15.20.510 this court should simply review ballots and ballot markings without searching into possible irregularities not apparent on the face of the ballot:

> Thus, in a recount appeal the court may not look behind the ballots to determine such questions as whether the voter was properly registered. The separate and

distinct remedy of an election contest pursuant to AS 15.20.450 [sic] is available to candidates who believe that illegal votes were cast or that other irregularities not reflected on the face of the ballot occurred during the course of the election.

Willis and the state maintained that the scope of the court's review in an appeal from a recount goes considerably beyond the ballots themselves.

■ It is clear from the existence of the two statutes that an election contest and a recount appeal are distinct proceedings.[5] In an election contest where no fraud, corruption or ineligibility of a party is alleged, the evidence presented must demonstrate the existence of malconduct sufficient to change the results of the election. In *Hammond v. Hickel*, 588 P.2d 256, 258–59 (Alaska 1978), we defined malconduct as "a significant deviation from statutorily or constitutionally prescribed norms" which introduces a bias into the vote. If no bias can be shown, even significant deviations from the norm will not amount to malconduct unless a knowing noncompliance with the law or a reckless indifference to norms established by law is demonstrated. *Id.* at 259. Having established the existence of malconduct, the plaintiff in an election contest must also show that the malconduct was sufficient to change the election results. *Id.* In contrast, the inquiry in a recount appeal is whether specific votes or classes of votes were properly counted or rejected. The concept of malconduct does not enter into the question, except insofar as particular acts or shortcomings of election officials may have resulted in the improper counting or rejecting of votes.

---

**3.** *See* note 2 *supra.*

**4.** AS 15.20.540 provides:

> *Grounds for election contest.* A defeated candidate or 10 qualified voters may contest the nomination or election of any person or the approval or rejection of any question or proposition upon one or more of the following grounds: (1) malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election;

> (2) when the person certified as elected or nominated is not qualified as required by law; (3) any corrupt practice as defined by law sufficient to change the results of the election.

**5.** *See Rives v. Pettit*, 513 S.W.2d 475, 483 (Ky. 1974); *State ex rel. Booth v. Board of Ballot Comm'rs of Mingo County*, 156 W.Va. 657, 196 S.E.2d 299, 309 (1973).

■ It does not follow from the somewhat different objectives of the election contest and the recount appeal that a recount appeal must be limited solely to determining the facial validity of the ballots, however. In order to make a proper review of the recount, this court must have the power to search underlying records and election materials to ensure that a vote was cast in compliance with the requirements of Alaska's election laws.

That the recount appeal involves more than the facial validity of the ballots is indicated by the language of AS 15.20.510, which requires that the Lieutenant Governor furnish the court with "the record of the recount taken including all ballots, registers, and other election material and papers pertaining to the election contest."[6] If the recount appeal were confined to simply reviewing the ballots themselves it would be unnecessary for the court to have access to such information. The court is further directed to determine whether the Lieutenant Governor properly determined which ballots should be counted and for whom. It is impossible to determine whether ballots were properly counted or rejected without inquiring into such issues as whether the voter was properly registered or was a resident of the district in which he or she voted. These are questions that cannot be answered by simply looking at the ballots themselves. We also note that the Lieutenant Governor's authority to conduct a recount is not limited to inspection of the ballots. He must review all ballots, counted or uncounted for whatever reason, and make rulings as to whether they were properly included or excluded in the canvass.[7] As a matter of course this involves making rulings on questioned or challenged ballots and must necessarily go beyond the ballots themselves. To limit the court on appeal from the recount to an inspection of the facial validity of the ballots would make the appeal meaningless, as it would not be a full review of the Lieutenant Governor's decisions.

■ In this case Judge Ripley determined that all of the issues raised were properly recount appeal issues. Acting in his capacity as superior court judge in the election contest, he found, upon motion for summary judgment, that there had been no showing of malconduct sufficient to change the outcome of the election and granted summary judgment. In his capacity as special master, he then reviewed the evidence presented regarding the validity of each of the challenged ballots. We agree that this was the proper way to proceed. We now turn to the substantive issues raised in the appeal.

1. Absentee ballots with late postmarks.

AS 15.20.150[8] sets out the procedure to be followed for the casting and counting of absentee ballots. Under the statute, a person wishing to cast an absentee ballot places the ballot in a plain envelope which is then placed inside a larger envelope. The voter then signs the voter's certificate on

6. See note 2 supra.

7. AS 15.20.480 provides in pertinent part:

Procedure for recount. In conducting the recount, the lieutenant governor, or his appointed representative, shall review all paper, absentee, and machine ballots whether or not the ballots were counted at the precinct or by the district absentee canvassing board to determine which ballots, or parts of ballots, were properly marked and which ballots are to be counted in the recount, and may check the accuracy of the original count, the precinct certificate and the canvass.

8. AS 15.20.150 provides:

Casting vote by personal representative or by mail. Upon receipt of an absentee ballot through a personal representative or by mail, the voter, whether in or outside the state, in the presence of an attesting witness who is at least 18 years of age, may proceed to mark the ballot in secret, to place the ballot in the small blank envelope, to place the small envelope in the larger envelope, and to sign the voter's certificate on the back of the larger envelope in the presence of the above-listed official or described persons who shall sign as attesting witnesses. The voter may then return the ballot properly enclosed in the envelopes, by personal representative to the election official who provided the ballot or by the most expeditious mail service, postmarked not later than the day of the election, to the election supervisor in his district.

the back of the large envelope in the presence of an attesting witness. The voter's certificate includes a space for the date. The statute provides that the ballot must then be returned to an election office postmarked no later than election day. Upon receipt of an absentee ballot, the election official marks it with a stamp indicating the date received. In this case, six ballots with postmarks and date stamps later than election day were counted in the recount. Each of the ballots had been signed by attesting witnesses, and the date space on the voter's certificate indicated that the vote had been cast on or before election day. Appellant Willis maintains that these ballots should not have been counted.

In *Hammond v. Hickel,* we were asked to review AS 15.20.150 to determine whether certain absentee ballots which did not bear postmarks or had not been either witness-dated or date-stamped by election officials should be counted. It was not necessary to resolve the precise question presented here—whether absentee ballots bearing unexplained late postmarks but timely witness dates should be counted—because the parties stipulated that ballots bearing late postmarks would not be counted. Nevertheless, our ruling in *Hammond v. Hickel* provides the controlling principles to be applied in this case. We held that the postmark, witness date and date stamping provisions of AS 15.20.150 were directory and not mandatory,[9] stating that:

> The purpose of AS 15.20.150 and of AS 15.20.170 is to provide methods by which to insure that absentee ballots have been cast on or before election day. All absentee ballots in question here were objectively determined to have been cast on or before the election day. *The mandatory requirement that ballots be marked on or before election day is satisfied by a date received stamp, or a postmark, or the date of witnessing of the voter certificate, or any combination of these.*

588 P.2d at 269 (emphasis added).

█ In this case each of the challenged absentee ballots had been signed by a witness on or before election day. Each ballot thus carried some indication that it had been cast in a timely manner. The late postmarks were, for the most part, easily explainable. One voter, for example, cast his ballot at the United States Embassy in Rabat, Morocco. The ballot was witness-dated November 7, 1978, but apparently went through State Department mail channels and was not postmarked until November 17, 1978 in Washington, D.C. Other ballots were postmarked on November 8, 1978. There was evidence that depending upon where a letter is mailed from, and the collection time for that location, a letter could be mailed on one day and yet bear the next day's postmark. The purpose of AS 15.20.150 is to insure that absentee ballots are cast on or before election day. 588 P.2d at 269. That purpose was fulfilled here. No evidence of fraud or impropriety has been brought forth regarding any of the challenged ballots. They were properly counted in the recount.

---

9. The difference between mandatory and directory provisions of election statutes lies in the consequence of nonobservance: An act done in violation of a mandatory provision is void, whereas an act done in violation of a directory provision, while improper, may nevertheless be valid.
 *State ex rel. Ahlgrimm v. State Elections Bd.,* 82 Wis.2d 585, 263 N.W.2d 152, 156 (1978), *quoting Lanser v. Koconis,* 62 Wis.2d 86, 214 N.W.2d 425, 427 (1974); *Gradinjan v. Boho,* 29 Wis.2d 674, 139 N.W.2d 557, 561 (1966); *see Carr v. Thomas,* 586 P.2d 622, 626–27 (Alaska 1978).
 All provisions of the election law are mandatory, if enforcement is sought before election in a direct proceeding for that purpose; but after election all should be held directory only, in support of the result, unless of a character to affect an obstruction to the free and intelligent casting of the vote or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.
 *Carr v. Thomas,* 586 P.2d 622, 626 (Alaska 1978), *quoting Rich v. Walker,* 237 Ark. 586, 374 S.W.2d 476, 478 (1964). *See People ex rel. Meyer v. Kerner,* 35 Ill.2d 33, 219 N.E.2d 617, 620 (1966); *Lanser v. Koconis,* 62 Wis.2d 86, 214 N.W.2d 425, 427 (1974).

2. Ballots of Voters Purged from Voters' Lists Under AS 15.07.130.

██ AS 15.07.130 [10] provides for the periodic purging from the voters' lists of the names of voters who have not voted in any statewide election in the previous four years. Under the statute, individuals who have not voted in the previous four years are placed on a purge list and notified. They are given ninety days to respond if they wish to have their names removed from the purge list. If they do respond, their name is taken off the purge list for that year. Until they vote in a statewide election however, their name will continue to appear on subsequent purge lists. If they do not respond, their name is removed from the master list of registered voters. A person whose name is purged from the voters' list may become eligible to vote again by re-registering at least thirty days prior to the election.[11]

In the November 7, 1978 election, a number of voters in District F who claimed to have been improperly purged from the voters' list were allowed to cast questioned ballots. These questioned ballots were not counted in the recount following a check of the master voter list with negative results. After reviewing the election records, voter registration materials, and evidence presented by the parties in this case, the special master concluded that "these individuals were purged consistent with the statutory norms and the practice of the

Division of Elections." We see no reason to disagree with this conclusion.

3. Punchcard Ballots on Which Some Boxes had Been Punched While Others had Been Circled and Not Punched.

██ Two punchcard ballots were received on which the voter had circled the box opposite certain candidates' names, including Willis' name, and then punched out all of the circled boxes except for the box opposite Willis' name. The Lieutenant Governor concluded that it was impossible to determine whether the circled box next to Willis' name indicated that the voter had actually voted for Willis or whether he had initially intended to vote for Willis and then changed his mind. The two ballots were thus not counted. The master confirmed this ruling.

In *Hickel v. Thomas*, 588 P.2d 273, 274 (Alaska 1978), we ruled that punchcard ballots marked by pen or pencil instead of punched were valid. Willis maintains that this ruling controls here. However, the Lieutenant Governor properly recognized the difference between the present situation and the situation in *Hickel v. Thomas*. In *Hickel v. Thomas*, certain of the boxes on the ballots had only been marked by pencil; none had been punched. These ballots were properly counted because the intent of the voter was clear. In contrast, the ballots questioned here do not, on their face,

---

10. AS 15.07.130 provides:

> *Elimination of excess names.* (a) At the close of each calendar year the area election supervisor shall examine the register.
>
> (b) When a registered voter has not voted in either a primary or general election at least once in four consecutive calendar years, the voter shall be advised by mail sent to his last known address that his registration will be cancelled unless he indicates within 90 days on forms furnished by the lieutenant governor his desire to remain registered.
>
> (c) The lieutenant governor shall obtain from the office of vital statistics death certificates and presumptive death certificates for all residents over 18 years of age who have died or who have been presumptively declared dead. The lieutenant governor shall cancel the registration of all deceased voters.

11. AS 15.07.090(b) provides:

> A voter shall re-register if his registration is cancelled for failure to vote in prior elections as provided in § 130 of this chapter. The re-registration may not be made later than 30 days preceding an election.

In 1978, of approximately 207,470 registered voters in the state, only 9,469, or 4.5%, had not voted in a statewide election in the previous four years. These voters were placed on the purge list and notified. Approximately 1,555 of those notified responded to the notice and avoided being purged. Of the remainder, it appears that, exclusive of District F, only 167 attempted to vote in the 1978 election and were refused because they had been purged. Thus less than 3% of those purged attempted to vote.

present clear evidence of the voters' intent. The voter may have intended to cast a vote for Willis by circling the box next to his name. But the fact that the voter then punched the circled box in each race except for the District F senatorial race makes it equally likely that the voter changed his mind and decided not to vote for Willis. Since there was no way to tell, the Lieutenant Governor properly concluded that the ballots should not be counted.

### 4. Punchcard Ballots With Punchmarks Not Centered in Candidate's Square.

 Eight ballots were challenged by Willis because the punched holes were not directly centered in the candidate's square. Each of these ballots touched the candidate's square and clearly obliterated at least the upper line of the square. The ballots were counted by the Lieutenant Governor. Our ruling on the challenged ballot markings in *Hickel v. Thomas* makes it clear that the crucial question in determining the validity of ballot markings is one of voter intent. In that case we did rule that those punchcard ballots punched either immediately above the first candidate's name or immediately below the last candidate's name were not to be counted. 588 P.2d at 274. In each case here, however, the marking complained of did not miss the candidate's square completely. Each punchmark touched the square sufficiently to obliterate the printed upper boundary of the box. As the state points out, a distinction must be drawn somewhere between those marks that are sufficiently inside the box and those that are too far outside to be counted. We find no error in the Lieutenant Governor's ruling that any mark obliterating the boundary line was sufficiently within the box to be counted.

### 5. Absentee Voters Who Reported A Non-Military Permanent Residence in a Different District.

 Donna L. Mott and William Mott voted absentee ballots in the primary election. William Mott is in the military. Both are registered voters in District F. When they applied for absentee ballots they used a form provided by the federal government. Both indicated on the form, in the space provided for "home (not military) residence", that they were residents of "Matanuska-Susitna" (which is not in District F), in care of the "Borough Tax Office, Palmer, Alaska." Willis argues that this constituted a change of residence and that the Motts' votes should not have been counted because they were not residents of District F.

AS 15.05.020(10) provides:

The address of a voter as it appears on his official voter registration card is presumptive evidence of the person's voting residence. If the person has changed his voting residence, this presumption is negated only by the voter executing an affidavit on a form prepared by the lieutenant governor setting out his new voting residence.

Under AS 15.05.020(1)

No person may be considered to have gained a residence solely by reason of his presence nor may he lose it solely by reason of his absence while in the civil or military service of this state or of the United States or of his absence because of marriage to a person engaged in the civil or military service of this state or the United States, . . .

Both Mr. and Mrs. Mott registered in District F in 1968 and have voted there in statewide elections in 1970, 1972, 1974, 1976 and 1978. They have never filed a change of residence form with the state, and Patty Ann Polley, Director of the Division of Elections for Alaska, indicated in her deposition that the federal government's absentee ballot application form is not considered an affidavit of change of residence under AS 15.05.020(10). The language of AS 15.-05.020 expressly creates a presumption that a voter has not changed residence and states that the presumption can only be overcome by an affidavit provided by the Lieutenant Governor. No such affidavit was executed here, and all other evidence in the record indicates that the Motts considered themselves residents of District F. There was no error in counting their votes.

**6. Attempt to Change Erroneous Address on Election Day.**

 Mary E. Elliott filled out a voter registration application on October 5, 1978, but failed to supply her complete street address as required by AS 15.07.060.[12] On election day, Ms. Elliott filled out a second voter registration form. This time she included her complete address. Her ballot was not counted in the original canvass or the recount.

Appellant Willis contends that her vote should have been counted because of an internal policy of the Division of Elections. Under the policy, corrections to minor defects in voter registration information are dated back to the date of original registration. It is Willis' theory that the supplying of the correct address on election day cured the defect in Ms. Elliott's October 5 registration and that Ms. Elliott was thus a qualified voter.

Despite the Election Division's apparent internal policy, there are limits to the extent to which defects in registration can be ignored or "cured" after the fact. Alaska's election laws require that a person be properly registered in the district in which the vote is to be cast at least thirty days before the election. In *Hammond v. Hickel*, we strictly construed AS 15.07.090(a), requiring voters whose names are changed to re-register at least thirty days prior to the election if they desire to vote under their new names. 588 P.2d at 271. Votes of those who had not done so were held invalid. It is difficult to see how the omission of the voter's complete address can be considered a "minor" omission. Election officials could not have told from the information given what district or precinct Ms. Elliott should be voting in. This is obviously an important piece of information, which goes to the very purpose of the registration requirement. Nor does the failure to provide all essential information appear to have been

the fault of election officials. The Lieutenant Governor properly ruled that Mary Elliott's ballot should not be counted.

**7. Absentee Ballots Without Proper Signature.**

 Two absentee ballots were received without signatures attached to the voter certificate, as required by AS 15.20.140 and AS 15.20.150. These ballots were not counted.

AS 15.20.210(a) provides guidance for regional canvass boards as to which absentee ballots may not be counted after the election. The statute provides in pertinent part:

> No ballot shall be counted if the voter has failed to properly execute the certificate, if the witnesses or the officer or other person authorized by law to administer the oath fails to affix his signature, or if the voter fails to enclose his marked ballot inside the small envelope provided.

This language was noted by the court in *Hammond v. Hickel*. In holding that the postmark and date stamp provisions for absentee ballots were not mandatory, we noted that AS 15.20.210 did *not* list absence of a proper postmark or date stamp as a violation of the absentee ballot statute mandating the invalidation of the ballot. 588 P.2d at 269. In contrast, failure to properly execute the voter's certificate is explicitly mentioned. The voter's signature is a basic part of the certificate and failure to properly attach it invalidates the ballot.

The case of *Lanser v. Koconis*, 62 Wis.2d 86, 214 N.W.2d 425 (1974) does not require a different result. In *Lanser*, the Wisconsin Supreme Court held that substantial compliance with the signature requirement of the voter's certificate was sufficient. However it appears that in that case most, if not all, of the challenged ballots had in fact been signed, even if they had not been signed in the proper place. As noted by the

---

**12.** AS 15.07.060 provides in pertinent part:

*Required registration information.* (a) Each applicant who requests registration or re-registration shall supply the following information:

· · · · ·

(2) address and other necessary information establishing residence if requested; . . .

special master, the Wisconsin court was influenced by the fact that the voter's certificate and the instructions on how to fill it out were confusing and difficult to understand, and by the fact that the questionable ballots had already been counted and irretrievably commingled. These factors are not present in the instant case.

8. Votes of Ward Blair and Bobby R. Neeley.

██ Upon investigation, the state has conceded that Ward Blair and Bobby R. Neeley were properly registered voters, even though their names were not on the voters' lists on election day. The error may have been caused by a failure of registrars to send their registration applications to the Division of Elections. Under similar circumstances the Division of Elections has considered the voter to have been properly registered. The errors in this instance were solely on the part of the election officials. The master concluded that the votes should be added to the vote totals. We concur.

Conclusion.

With the exception of the votes of Neeley and Blair, the challenges to the recount raised by appellant Willis are overruled. Since the two changed votes do not affect the outcome of the election, we see no reason to address the objections raised by Kelly on cross-appeal to votes counted for Willis.[13] The Lieutenant Governor's certification of Kelly as the winner is AFFIRMED.[14]

---

13. *See Rodriguez v. Thompson*, 542 S.W.2d 480, 486 (Tex.Civ.App.1976); *Lanser v. Koconis*, 62 Wis.2d 86, 214 N.W.2d 425, 431 (1974).

14. We express our gratitude to Judge Ripley for his excellent and prompt work as special master.