Victor FISCHER,
Petitioner/Cross-Respondent,

v.

Sandra STOUT, Director of the Alaska
Division of Elections, and Stephen A.
McAlpine, Lieutenant Governor of
Alaska, Respondents,

Rick Uehling,
Respondent/Cross-Petitioner.

No. S–1953.

Supreme Court of Alaska.

Aug. 7, 1987.

Don Clocksin, Wagstaff, Pope, Rogers & Clocksin, Anchorage, Joseph H. McKinnon, Anchorage, for petitioner/cross-respondent Fischer.

Susan D. Cox, Asst. Atty. Gen., Anchorage, Ronald W. Lorensen, Acting Atty. Gen., Juneau, for respondents Stout and McAlpine.

James T. Robinson, David A. Devine, Robinson, Devine & Holliday, Anchorage, for respondent/cross-petitioner Uehling.

## OPINION

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

BURKE, Justice.

This is an election recount appeal filed pursuant to AS 15.20.510.[1] The principle issue is whether certain votes or classes of votes were properly counted or rejected in the November 1986 election for the state senate in Senate District H.

The election results were certified on November 24, 1986. Republican candidate Rick Uehling was declared the winner with 6,730 votes. The incumbent, Victor Fischer, who received 6,715 votes, requested a recount. Following the recount, Uehling was again declared the winner with 6,738.5 votes to Fischer's 6,721.5.[2] Fischer then filed the instant appeal[3] and Uehling cross-

---

1. AS 15.20.510 provides:

   A candidate or any person who requested a recount who has reason to believe an error has been made in the recount (1) involving any question or proposition or the validity of any ballot may appeal to the superior court in accordance with applicable court rules governing appeals in civil matters, and (2) involving candidates for the legislature or Congress or the office of governor and lieutenant governor may appeal to the supreme court in accordance with rules as may be promulgated by the court. Appeal shall be filed within five days of the completion of the recount. Upon order of the court, the director shall furnish the record of the recount taken including all ballots, registers, and other election material and papers pertaining to the election contest. The appeal shall be heard by the court sitting without a jury. The inquiry in the appeal shall extend to the questions whether or not the director has properly determined what ballots, parts of ballots, or marks for candidates on ballots are valid, and to which candidate or division on the question or proposition the vote should be attributed. The court shall enter judgment either setting aside, modifying, or affirming the action of the director on recount.

2. The fractional vote given to each candidate is the result of a proportionate reduction in their vote totals. This adjustment was apparently made to compensate for a counting error. The adjustment is discussed in Part III(b), *infra*. *See also*, note 14 *infra*.

3. Fischer also challenged the election in an action filed in superior court pursuant to AS 15.-20.540. That action was ordered stayed pending our resolution of this appeal.

appealed on certain issues. On January 16, 1987, we issued an order vacating the certificate of election declaring Uehling the prevailing candidate and remanded the matter to the Director of Elections (Director) for a partial further recount.[4] We indicated at that time that an opinion would follow.

## I. SCOPE OF REVIEW

■ On December 4, 1986, following Fischer's request for a recount, a meeting was held between the Director, Fischer, and Uehling wherein it was explained to the candidates that they would have until December 6, 1986 to make specific challenges to specific ballots or any challenges would be deemed waived. Both candidates appeared to understand these instructions and neither objected to the deadline. Both candidates did submit written comments and ballot challenges by December 6 but, despite the fact that the deadline had passed, Fischer later challenged at least thirty-six additional ballots.

The Director urges us to limit our review in this recount appeal to those individual ballots specifically challenged by December 6, 1986 under the specific error alleged at the time of the challenge. In effect, the Director argues that our review authority under AS 15.20.510 is limited to a review of those ballots upon which the Director has actually made a specific determination. Alternatively, she asserts that Fischer has either waived any challenges not raised by December 6 or that lack of notice should prevent Fischer from asserting new challenges not listed in his original complaint.

While he neither admits nor denies that he has raised new challenges, Fischer argues that candidates are entitled to submit materials for consideration up until final certification of the recount. Any establishment of a deadline, Fischer asserts, is arbi-

trary and unsupported by statute or regulation. Fischer's argument is persuasive.

We are unaware of any specific legislative or administrative pronouncement providing the Director authority to set deadlines for submission of specific ballot challenges. Consequently, the December 6 deadline will not be given effect. While imposition of the Director's deadline may well have been wise and expeditious, streamlining the recount and providing faster certification, we will not imply from the legislative and administrative silence an intent to provide the Director with the authority to arbitrarily limit the scope of a recount.[5]

Our obligation under AS 15.20.510 is to determine whether a "vote was cast in compliance with the requirements of Alaska's election law." *Willis v. Thomas,* 600 P.2d 1079, 1082 (Alaska 1979).[6] That obligation may not be discharged by a limited review of the Director's specific determinations, but must extend to a review of all ballots questioned on any basis. Accordingly, we hold that our obligation under AS 15.20.510 is to review any and all questioned ballots cast in the election at issue, regardless of whether they were or were not specifically challenged below.

## II. BALLOT CHALLENGES: FISCHER

### a. *Punch-Card Ballots*

Fischer complains of the Director's decision to count or reject certain punch-card ballots based upon the methods used to mark those ballots. There are eight such ballots, five called for Uehling and three called as blank. In each of these challenges we must examine the ballot to determine whether the voter's intent can be adequately identified. *Willis,* 600 P.2d at 1084–85; *Hammond v. Hickel,* 588 P.2d 256, 274 (Alaska 1978). We conclude that the Director's call in each case was correct.

---

4. We take judicial notice that after the order issued, partial recount was conducted and Uehling again certified as the prevailing candidate.

5. We express no opinion as to the Director's authority to establish recount guidelines through the normal process for promulgating administrative regulations.

6. Although *Willis* was decided under a different version of AS 15.20.510, the *only* difference between the statute then and now is that the "director" has been substituted for the "lieutenant governor" as the person whose decision is reviewed.

■ Fischer also challenges one ballot, called for Uehling, upon which the voter signed his or her name. Fischer argues that this ballot should have been declared a "spoiled ballot" and destroyed pursuant to AS 15.15.280—.300 (declaring "spoiled" ballots which have been "exhibited"). We are unable to agree that this ballot was "exhibited" within the meaning of AS 15.15.280 —.300. Accordingly, we affirm the Director's determination.

■ Finally, Fischer challenges two ballots, called for Uehling, which were marked entirely with a pen rather than punched. Fischer claims these votes should not have been counted because there was a punch-card machine available. Neither AS 15.15.-360 (rules for counting hand-marked ballots) nor AS 15.20.730 (rules for counting punch-card ballots) require voters to use a punch-card machine if one is available, but only specify the manner of counting properly punched and hand-marked ballots. Moreover, in *Hammond,* we held that punch-card ballots marked entirely by pen or pencil instead of punched were valid because they provided clear evidence of the voters' intent. 588 P.2d at 274. *Accord, Willis,* 600 P.2d at 1084. The voters' intent on these challenged ballots is clear. Accordingly, we affirm the Director's decision.

### b. *Absentee Ballots: Voter Residence in Question*

■ Voters in state and local elections must be residents of the election district in which they vote. Alaska Const. art. V, § 1; AS 15.05.010(4). A person's residence is that fixed place of habitation to which the individual intends to return if absent. AS 15.05.020(2). It need not be a house or apartment. It need not have mail service. A residence need only be some specific locale within the district at which habitation can be specifically fixed. Thus, a hotel, shelter for the homeless, or even a park bench will be sufficient. *See Pitts v. Black,* 608 F.Supp. 696 (S.D.N.Y.1984);

*Collier v. Menzel,* 176 Cal.App.3d 24, 221 Cal.Rptr. 110 (1985).

■ Fischer contests the ballots of five voters who listed as their residence address only "Elmendorf Air Force Base." Elmendorf Air Force Base is a bounded area wholly within Senate District H. Thus, merely listing "Elmendorf Air Force Base" is sufficient to fix a voter's residence to a specific locale within District H. These votes were properly counted.

Fischer also challenges those absentee voters who registered to vote using a post office box or private mail service as the voter's residence. A post office box or private mail service address is clearly not a voter's fixed place of habitation and is therefore insufficient to fix a voter's residence within a voting district.[7] Thus, any voter providing such an address as his or her residence would be ineligible to vote unless he or she provided additional information regarding that voter's residence.

■ Both Cyrette Sanford and Lash G. Sanford registered with a post office box address. However, both also requested, on their absentee ballot application, that their registration be updated to reflect a new residence address: Elmendorf Air Force Base. This address update provided sufficient information to ascertain their residence within District H. These votes were properly counted.

■ Seven voters registered using the address of a private mail service without providing any additional information as to their residence. Thus, those voters provided insufficient information to ascertain their residence within District H and should not have had their ballots counted. The ballots of the following voters were improperly counted: Andrea S. Ellis, Robert L. Jones; Treva E. Jones; John D. McCannell; Phyllis E. Neher and Thomas S. Stein.

■ Finally, Fischer contests the ballot of a single voter, Jennifer Gomilar, who is alleged to have registered using a non-exis-

---

**7.** We take judicial notice that human beings are of insufficiently diminutive stature to dwell comfortably within such a space.

tent address.  One may not, of course, reside in a nonexistent locale.  In this instance, however, no evidence was produced indicating that Jennifer Gomilar did not reside at her listed address at the time of registering, nor did Ms. Gomilar provide the affidavit required to rebut the presumption of residency provided by AS 15.-05.020(10).  This ballot was properly counted.

### c.  Overseas Voters

■ The Director counted some fourteen absentee ballots from voters living outside the United States.  Persons residing outside the United States may register to vote in Alaska pursuant to AS 15.05.011 [8] if they were domiciled in Alaska before leaving the United States and meet various other requirements as specified.  Fischer asserts that a voter registered pursuant to AS 15.05.011 may vote only in federal, not state, elections and thus these ballots should not have been counted.

Fischer is quite correct in asserting that a voter who actually registered pursuant to AS 15.05.011 may not vote in a state race.  See AS 15.05.011(d).  However, a person living outside the United States is not required to register pursuant to AS 15.05.-011, but may vote by absentee ballot in Alaska if that person is otherwise qualified pursuant to AS 15.05.010.  Here, every questioned voter listed a presumptively valid Alaska residence within District H and was otherwise qualified.  Because no evidence was produced rebutting the presumption of residence, these ballots were properly counted.

### d.  Persons Allegedly Residing Outside District H

■ Fischer also challenges thirteen ballots on the ground that each voter had executed an affidavit setting out a new voting residence outside District H and therefore the presumption of AS 15.05.-020(10) [9] had been rebutted.  The affidavits to which Fischer refers are declarations that appeared on the envelope in which each of these voters returned his or her absentee ballot.

Absentee ballots must be returned in a special envelope which contains an oath that the voter is a qualified voter in all respects.  AS 15.20.030.  The voter oath includes a space for the absentee voter to fill in his or her "permanent Alaskan residence."  Fischer claims that since the absentee voter oath was a "form prepared by the director" and since the challenged voters each indicated under oath a residence outside District H, these ballots should not have been counted.

Fischer's argument has merit.  Because these affidavits come within the literal definition of the statute by which the presumption of voter residence may be rebutted, they cannot be disregarded as were the forms prepared by the federal government at issue in Willis.  600 P.2d at 1085.  Thus, the following ballots should not have been

---

**8.**  AS 15.05.011 provides:

*Qualifications of overseas voters.*  (a) A person residing outside the United States may register and vote absentee by qualifying under this section.

(b) Before registering a person under this section, the director shall determine that the person

(1) was domiciled in the state immediately before leaving the United States;

(2) meets the qualifications established in AS 15.05.010(1) and (2);

(3) has not established a domicile in another state, territory, or possession of the United States since leaving this state;

(4) is not registered to vote and has not voted in another state, territory, or possession of the United States since leaving this state;

(5) has a valid passport, card of identity and registration, or other identification issued under the authority of the United States Secretary of State, and identification complying with the requirements of this title.

(c) Lack of a place of abode in the state or lack of intent to return to this state does not disqualify a person who qualifies under (b) of this section.

(d) A person registered under this section may vote in a federal election in this state.

**9.**  AS 15.05.020(10) provides:

The address of a voter as it appears on his official voter registration card is presumptive evidence of the person's voting residence.  If the person has changed his voting residence, this presumption is negated only by the voter executing an affidavit on a form prepared by the director setting out his new voting residence.

counted because the voters reside outside District H: Anita Gilmore; Carol S. Kirkland; Walter C. Kirkland; Elizabeth B. Larsen; M. Inez Lee; Lucia S. Mandapat; Leonard D. Neher; LaMar Noth; Robert Six; Vicki L. Six; and Betty Sue Williams.

The ballots of Laura J. Sims, Neal C. Sims and Susan Schreib, though challenged on identical grounds, were properly counted. As to these ballots there was insufficient evidence on the ballot or ballot envelope to indicate that the voters intended to register a new permanent Alaska residence.

### e. *Absentee Ballot Attestation Defects*

█ Fischer contends that thirty absentee ballots were improperly counted on the ground that the attesting officer failed to adequately indicate the source of that officer's attestation authority. Alternatively, he asserts that if these thirty ballots were properly counted, the Director's disqualification of another ballot on the identical ground was improper.

Absentee ballot voting by mail is governed by AS 15.20.081. AS 15.20.081(d) provides that an absentee ballot will be valid only if the ballot envelope is signed by the voter in the presence of an attesting officer. The officer must in turn sign and date the attestation section of the envelope immediately thereafter. AS 15.20.081(d) and 6 AAC 25.110(a) specify the classes of persons authorized to serve as an attesting officer.[10] If no appropriate officer is available, the voter may sign the voter's certificate in the presence of two persons over the age of eighteen years and have those two witnesses sign the attestation form. AS 15.20.081(d); 6 AAC 25.110(b).

Fischer maintains that a ballot must be found void and thus uncountable unless the authority of the attesting officer is clear from the face of the ballot envelope and because the Director has provided space in the attestation section wherein this information may be provided. We disagree.

Fischer indicates no authority, and we are aware of none, which requires the production of such information. Therefore, the officer's failure to provide the source of that officer's authority will not of itself invalidate the ballot.

It must be presumed that persons who attest an absentee ballot as an authorized official do so in full cognizance of the text and oath on the absentee ballot form. This presumption may be rebutted by an affirmative showing that the attesting officer lacks appropriate authority. Because Fischer has produced no evidence rebutting the presumption of authorization, all ballots challenged on this basis were properly counted. Conversely, it naturally follows that the Director's disqualification of Vincent McClelland's ballot for the failure of the attesting officer to adequately identify the source of the officer's authority was improper. Mr. McClelland's ballot should have been counted.

### f. *Individual Ballot Challenges*

█ 1. *Maritza M. Munoz.* Ms. Munoz asserts that she was properly registered in August 1986 at the Cowper for Governor Campaign Headquarters. Her statements are corroborated by Cathy Allen, a certified voter registrar, who assisted Ms. Munoz in completing the voter application. Apparently Ms. Munoz's forms were lost somewhere along the line and Ms. Munoz was forced to vote a questioned ballot. The election officials found this evidence insufficient to establish that Ms. Munoz was a qualified elector and refused to count her ballot.

In *Willis* we upheld the decision of a master to count the votes of two voters whose names did not appear on the voters list because the registrars failed to send their registration applications to the Division of Elections. 600 P.2d at 1087. As in *Willis*, the error with regard to Ms. Munoz's application was "solely on the part of

---

**10.** These persons are: (1) justice; (2) judge; (3) magistrate; (4) clerk of court; (5) notary public; (6) United States Postmaster or authorized postal clerk; (7) any commissioned officer of the armed services, including the National Guard and United States Coast Guard; (8) election judge on election day; (9) absentee voting official; (10) division of election employee; (11) any other person qualified to administer oaths.

the election officials." *Id.* Her vote should have been counted.

■ 2. *Daryl Wallace.* When attempting to correct an error in the address given on his voter registration card, Mr. Wallace checked the box cancelling his registration. Fischer argues that the voter registration card is confusing and that Mr. Wallace's ballot should have been counted. We agree. A voter's franchise will not be withdrawn unless the voter's intent to have it withdrawn is clearly and unambiguously expressed. In this case we can not say that Mr. Wallace's intent was unambiguous. His vote should have been counted.

■ 3. *Howard Baker.* The Director refused to count the ballot of Mr. Baker on the ground that the attesting officer had initialed the attestation section rather than signed. It is black letter law that any mark intended as a signature will function as such.[11] Moreover, we are unaware of any legislative or administrative pronouncement specifying the form that the attesting officer's signature must take. Mr. Baker's ballot should have been counted.

■ 4. *Glen Greeley.* The voter registration records indicate that Mr. Greeley has never been registered in District H. Though there is some evidence indicating that Mr. Greeley had changed his residence to District H, the evidence is inconclusive and unconvincing. Additionally, the evidence is not the sort required by AS 15.05.-020(10) to rebut the presumption of residence. His vote should not have been counted.

■ 5. *Christian F. Kreps.* Ms. Kreps filed appropriate papers on October 15, 1985 to have her official voter residence changed to a residence outside District H but this change was not processed. Regardless, the records conclusively show that Ms. Kreps is not a resident of District H. Her ballot should not have been counted.

■ 6. *Michael E. Banasik.* Mr. Banasik changed his address to a residence outside the district in 1982. He has not changed it since. Mr. Banasik's ballot should not have been counted. AS 15.05.-020(10).

■ 7. *Gary W. King.* Captain King "witnessed" his own absentee ballot. Such a "witnessing" contravenes AS 15.20.-081(d). His ballot should not have been counted.

■ 8. *Margie D. Wagner-Jogerst.* Fischer asserts that Ms. Wagner-Jogerst originally registered by absentee ballot application without proper witnessing contrary to AS 15.07.070(b). Contrary to Fischer's assertion, however, Ms. Wagner-Jogerst clearly stated on the absentee ballot application that she wished merely to update her *current* registration and thus no witnessing was required. Fischer has offered no proof that Ms. Wagner-Jogerst was not officially registered at the time she filed her absentee ballot application. Her vote was correctly counted.

9. *Wilford A. Day.* Mr. Day "witnessed" his own ballot. His vote was improperly counted (see #7 above).

■ 10. *Mason McLean.* Mr. McLean was originally registered outside District H. Though he later moved to a locale within District H, he has never updated his official voter residence address and so may not vote within the district. AS 15.05.-020(10). His vote was improperly counted.

■ 11. *Ira E. Hill.* Mr. Hill originally registered by submitting an absentee ballot application. Because his application was not witnessed or attested, the registration contravened AS 15.07.070(b) and was therefore invalid. Mr. Hill's vote should not have been counted.

### III. JOINT CHALLENGES

#### A. *Name Changes*

■ Six women attempted to vote by signing a name different from that under which they were registered. Though it is not contested that each woman was properly identified as a person registered to vote, each was told that she must vote a ques-

<hr>

11. *See* Section III(a) *infra.*

tioned ballot. Five of these women listed on their submitted ballots their current names, the names under which they were previously registered and none were told that signing a ballot with a name different from that under which they were registered would invalidate their ballots. Nevertheless, all six ballots were rejected pursuant to unpublished policy. Both Fischer and Uehling contest the treatment of these ballots as contrary to law.

AS 15.07.090(a) provides that:

A voter whose name is changed by marriage or court order may vote under the previous name, but if the voter desires to use the new name, he or she shall notify the director not later than 30 days preceding an election so that the registration may be amended to reflect the change.

Though we have discussed the requirements of AS 15.07.090(a) in other contexts, see Willis, 600 P.2d at 1086; Hammond, 588 P.2d at 271, we have not before had occasion to consider the specific question here raised: whether a voter who has changed his or her name since originally registering and who signs a ballot with a name different from his or her registered name has voted under his or her previous name pursuant to AS 15.07.090(a). Legislative history provides little guidance in interpreting the facially ambiguous phrase, "may vote under the previous name." Accordingly, we will seek a construction of the phrase which avoids the wholesale disfranchisement of qualified electors. See Carr v. Thomas, 586 P.2d 622, 626 (Alaska 1978).[12]

The Director argues that to vote "under the previous name," a voter must sign his or her registered name on the ballot and that signing with any other name or mark will invalidate that ballot. We cannot agree.

As a broad proposition, requiring a signature is nothing more than a means of affirming the identity of the signator and of authenticating the document on which the signature is affixed. The signature may be affixed in any manner and may consist of any character, symbol, figure, or name so long as such mark is intended by the signator as a substitute for the individual's given name. See generally 80 C.J.S. Signatures §§ 1(c), 2(a) (1953) and cases cited therein. AS 15.07.090(a) does not refer to signatures at all, let alone specify a particular form of signature. We thus see no justification for inferring a legislative intent to require the voter to sign using only his or her previous name. Rather, we think it evident that a voter votes "under the previous name" whenever the voter is positively identified as the registered individual and lists on the ballot his or her previous name. Analogy is useful here. There is no question that a voter registered under the name of Jane Doe would be allowed to vote by signing the ballot with an "X" so long as the voter was positively identified as Jane Doe, listed the name "Jane Doe" on the ballot, and intended the "X" as a substitute for her signature. We see no reason for invalidating the ballot because Jane Doe choose to sign "Jane Smith" instead. Thus, because five of these women here were properly identified as registered voters in District H and listed their previous name on their ballots, the following ballots should have been counted: Debra M. Sherwood (Rudloff); Alice Rodes (Bullington); Carrie Kee (Showers); Felicia Z. Gatewood (Williams); and Fannie J. Martin (Crowe).[13]

b. *Pro Rata Vote Reduction*

▇ After determining that seventeen ballots had been erroneously counted, the

---

12. In *Carr* we observed:

> Courts are reluctant to permit a wholesale disfranchisement of qualified electors through no fault of their own, and "[where] any reasonable construction of the statute can be found which will avoid such a result, the courts should and will favor it."

586 P.2d at 626 (quoting *Reese v. Dempsey*, 48 N.M. 485, 153 P.2d 127, 132 (1944) (footnote omitted)).

13. In our January 16, 1987 order we erroneously indicated that Penny A. Wild's ballot should have been counted. Penny A. Wild did not list her previous name, leaving blank the space following the line calling for a listing of a previous name. Thus, under our construction of AS 15.07.090(a), her ballot should not have been counted and the director's decision is upheld.

Director applied the *"Hammond* formula"[14] to proportionately reduce each candidate's actual vote total. Six votes were deducted from the District 12 absentee ballot count and eleven from District 13. The result was a pro-rata deduction of 6.5 votes from Fischer's total and 10.5 votes from Uehling's total.

Uehling argues that the Director exceeded her authority by using a proportionate reduction formula to actually change the official vote totals of each candidate. He contends that the Director's analysis should have ended when she correctly determined that the errors in the vote count were not sufficient to change the results of the election. We agree.

In *Hammond,* we discussed the proportionate reduction rule as the only method to properly determine the effect of any bias that affected individual votes in a random fashion. 588 P.2d at 260. We did not intend, however, that the technique was to be used to actually reduce the candidate's official total. As Uehling correctly points out, the technique was to be used only as an analytical tool to aid in the determination of whether the contaminated ballot actually would effect the result of the election.

Accordingly, in the recount proceeding which was conducted, each candidate's final vote total was reduced on a pro-rata basis for the limited purpose of determining whether the count errors noted above were errors of sufficient magnitude to change the result of the election in Senate District H. If the result was not changed, the Director was authorized to certify candidate Uehling as the prevailing candidate. If the result would have been changed, the Director was to report that fact to the court.[15]

We reject Fischer's assertion that the Director used the wrong "unit" on which to base her analysis. Fischer argues that the smaller the unit to which the votes can be traced, the more accurate the reduction will be. Here, Fischer contends, the votes can be traced to six smaller, and thus more accurate, units and he urges us to adopt his method and apply it to any and all votes we now declare invalid.

Whatever the theoretical merits of Fischer's argument, the record does not support a tracing to Fischer's "smaller units." In addition, established precinct or district levels are reasonably accurate, easy, and readily available units on which to base such determinations. Reference to those units will avoid considerable administrative difficulty, speed the recount and certification process, and will thus better serve the public interest.

### IV. CONCLUSION

Because of the disposition above, we need not consider Uehling's other assignments of error. For the reasons stated, pursuant to our authority under AS 15.20.-510, we entered the order of January 16, 1987.

---

**14.** *See Hammond,* 588 P.2d at 260 & n. 6 ("contaminated votes must be deducted from the vote totals of each candidate in proportion to the votes received by each candidate in the precinct or district where the contaminated votes were cast").

**15.** Because the errors set forth herein did not effect the result of the election, we need not, at this time, determine the procedure to be employed if the election result is put in doubt by application of the proportionate reduction rule.