Joe MILLER, Appellant,

v.

Mead TREADWELL, in his official capacity as Lieutenant Governor, State of Alaska, Division of Elections, and Lisa Murkowski, Appellees.

Lisa Murkowski, Cross–Appellant,

v.

Joe Miller, Mead Treadwell, in his official capacity as Lieutenant Governor, State of Alaska, Division of Elections, Cross–Appellees.

Nos. S–14112, S–14121.

Supreme Court of Alaska.

Dec. 22, 2010.

Thomas V. Van Flein, Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC, Anchorage, and Michael T. Morley, pro hac vice, Washington, D.C., for Appellant and Cross–Appellee Miller.

Joanne M. Grace and Laura F. Fox, Assistant Attorneys General, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for Appellees and Cross–Appellees Treadwell and State of Alaska, Division of Elections.

Timothy A. McKeever and Scott M. Kendall, Holmes Weddle & Barcott, Anchorage, for Appellee and Cross–Appellant Murkowski.

Thomas P. Amodio, Reeves & Amodio, LLC, Anchorage, for Amicus Curiae Alaska Federation of Natives.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

## OPINION

PER CURIAM.

### I. Introduction

This case presents several issues of constitutional and statutory interpretation that arise from the count of votes following the 2010 election for one of Alaska's two seats in the United States Senate. Two of the contestants for that seat—Joe Miller, the Republican nominee, and Senator Lisa Murkowski, running as a write-in candidate—are parties to the lawsuit. Without seeking a recount, Miller filed suit in superior court challenging several decisions of the Alaska Division of Elections in counting the votes. Murkowski intervened, challenging other vote-counting decisions of the Division. Superior Court Judge William B. Carey upheld the Division's actions. Miller appeals, and Murkowski cross-appeals.

### II. Longstanding Alaska Election Principles

In resolving the questions presented by the parties, we are governed by a number of longstanding principles that we have consistently applied to election issues in Alaska over the past 50 years.

■ We start with the bedrock principle that "[t]he right of the citizen[s] to cast [their] ballot[s] and thus participate in the selection of those who control [their] government is one of the fundamental prerogatives of citizenship." [1] The right to vote "is funda-

---

1. *Carr v. Thomas,* 586 P.2d 622, 626 (Alaska 1978) (quoting *Sanchez v. Bravo,* 251 S.W.2d 935, 938 (Tex.Civ.App.1952)).

mental to our concept of democratic government." [2] "[It] encompasses the [voter's] right to express [the voter's] opinion and is a way to declare [the voter's] full membership in the political community." [3] We articulated this principle over three decades ago in *Carr v. Thomas,* recognizing the profound importance of citizens' rights to select their leaders and noting that "[c]ourts are reluctant to permit a wholesale disfranchisement of qualified electors through no fault of their own." [4] In reviewing and interpreting election statutes, we have uniformly held that "[w]here any reasonable construction of [a] statute can be found which will avoid such a result, the courts should and will favor it." [5] We have applied this principle throughout the years because we recognize that the right to vote is key to participatory democracy. Guided by this polar principle, we declared in *Edgmon v. State, Office of the Lieutenant Governor, Division of Elections* that "the voter shall not be disenfranchised because of mere mistake, but [the voter's] intention shall prevail." [6] Most recently, in *State, Division of Elections v. Alaska Democratic Party,* we noted that "[w]e have consistently emphasized the importance of voter intent because the opportunity to freely cast [one's] ballot is fundamental." [7]

It is in light of our consistent application of these cardinal principles that we examine the issues presented in this case.

## III. Voter Intent Is Paramount, And Any Misspelling, Abbreviation, Or Other Minor Variation In The Form Of The Candidate's Name On A Write–In Ballot Does Not Invalidate A Ballot So Long As The Intention Of The Voter Can Be Ascertained.

■ Joe Miller seeks an interpretation of election statute AS 15.15.360 that would dis-

qualify any write-in votes that misspell the candidate's name. We do not interpret the statute to require perfection in the manner that the candidate's name is written on the ballot. Our prior decisions clearly hold that a voter's intention is paramount. [8] In light of our strong and consistently applied policy of construing statutes in order to effectuate voter intent, we hold that abbreviations, misspellings, or other minor variations in the form of the name of a candidate will be disregarded in determining the validity of the ballot, so long as the intention of the voter can be ascertained.

Miller points to language in AS 15.15.360(a)(11) providing that "[a] vote for a write-in candidate ... shall be counted if the oval is filled in for that candidate and if the name, as it appears on the write-in declaration of candidacy, of the candidate or the last name of the candidate is written in the space provided." He argues that this subsection, read in the context of other provisions of the statute, requires that a write-in candidate's name be written and spelled perfectly, even if the voter's intent to vote for a particular candidate can be readily ascertained. But when read as a whole, AS 15.15.360's purpose is inclusive, not exclusive; it is designed to ensure that ballots are counted, not excluded. And this inclusiveness is consistent with the overarching purpose of an election: "to ascertain the public will." [9]

**2.** *Dansereau v. Ulmer,* 903 P.2d 555, 559 (Alaska 1995). The United States Supreme Court recognized the principle that voting is a fundamental right, emphasizing: "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore,* 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

**3.** *Dansereau,* 903 P.2d at 559.

**4.** *Carr,* 586 P.2d at 626.

**5.** *Id.* (quoting *Reese v. Dempsey,* 48 N.M. 485, 153 P.2d 127, 132 (1944)).

**6.** 152 P.3d 1154, 1157 (Alaska 2007) (internal citations and quotations omitted).

**7.** Case No. S–14054, Order dated Oct. 29, 2010 at 3 (internal citations omitted).

**8.** *Edgmon,* 152 P.3d at 1157 ("[W]e have consistently emphasized the importance of voter intent in ballot disputes.").

**9.** *Boucher v. Bomhoff,* 495 P.2d 77, 79 (Alaska 1972) (internal quotations and citation omitted).

Miller urges that only his interpretation of the statute will "preserv[e] the integrity of the electoral process as a whole." But it is Miller's interpretation of the statute that would erode the integrity of the election system, because it would result in disenfranchisement of some voters and ultimately rejection of election results that constitute the will of the people. We have consistently construed election statutes in favor of voter enfranchisement.

Turning to the language of subsection (a)(11), it is evident that it does not require exact spelling. We agree with the State that subsection (a)(11) concerns pseudonyms. The "nickname" field on the declaration of candidacy form supports this interpretation. If that field were not present, a candidate with a pseudonym might write only his or her legal name on the form, thus invalidating ballots with the candidate's pseudonym written in.[10] The "nickname" field allows a candidate to ensure that his or her pseudonym "appears on the write-in declaration of candidacy"[11] so that the write-in votes listing that pseudonym will count. Thus, the word "appears" relates to a pseudonym's possible presence on the ballot, not the particular form of the vote, and demonstrates that the statute is inclusive—it is designed to include, rather than exclude, votes.

As we have recognized, "a true democracy must seek to make each citizen's vote as meaningful as every other vote to ensure the equality of all people under the law."[12] In order to ensure that each citizen's vote is as meaningful as every other vote, we must interpret the election statute to preserve a voter's clear choice rather than to disenfranchise that voter. The State characterizes the

standard urged by Miller as the "perfection standard," and we agree that such a standard would tend to disenfranchise many Alaskans on the basis of "technical errors."[13]

Alaskan voters arrive at their polling places with a vast array of backgrounds and capabilities. Some Alaskans were not raised with English as their first language. Some Alaskans who speak English do not write it as well. Some Alaskans have physical or learning disabilities that hinder their ability to write clearly or spell correctly. Yet none of these issues should take away a voter's right to decide which candidate to elect to govern. We must construe the statute's language in light of the purpose of preserving a voter's choice rather than ignoring it. As we have consistently ruled, we remain "reluctant to permit a wholesale disfranchisement of qualified electors through no fault of their own, and '[w]here any reasonable construction of the statute can be found which will avoid such a result, [we] should and will favor it.' "[14]

Our interpretation of AS 15.15.360 permitting abbreviations, misspellings, or other minor variations in the form of the name of a write-in candidate so long as the intention of the voter can be ascertained is also consistent with the federally mandated standard for counting the write-in votes of those voters living or serving in uniform overseas. The Uniformed and Overseas Citizens Absentee Voting Act provides that in counting the ballot of a uniformed services voter or other voter who is overseas, "[a]ny abbreviation, misspelling, or other minor variation in the form of the name of a candidate or a

10. *Compare* AS 15.15.360(11) (requiring write-in vote to include "name, as it appears on the write-in declaration of candidacy, of the candidate or the last name of the candidate"), *with* AS 15.15.030(4) (allowing the Director, in placing names on the ballot, to "include in the candidate's name any nickname or familiar form of a proper name of the candidate").

11. AS 15.15.360(a)(11).

12. *Dansereau v. Ulmer*, 903 P.2d 555, 559 (Alaska 1995); *see also Bush v. Gore*, 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ("Hav-

ing once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

13. *See Carr v. Thomas*, 586 P.2d 622, 625–26 (Alaska 1978) ("There is well-established policy which favors upholding of elections when technical errors or irregularities arise in carrying out directory provisions which do not affect the result of an election.").

14. *Id.* at 626 (quoting *Reese v. Dempsey*, 48 N.M. 485, 153 P.2d 127, 132 (1944)).

political party shall be disregarded in determining the validity of the ballot, if the intention of the voter can be ascertained." [15] The Alaska Administrative Code incorporates this requirement into state law.[16] Miller's proposed construction of the statute would require us to impose a different, and more rigorous, voting standard on domestic Alaskans than on those who are serving in the military or living abroad. Our construction of AS 15.15.360 treats overseas and domestic Alaskan voters equally, ensures that each write-in vote is treated equally and counted in the same manner, and avoids valuing one person's vote over that of another.[17]

Finally, Miller suggests that our interpretation of AS 15.15.360 will lead to elections being decided by the unbridled discretion of election officials in determining voters' intent through visual inspection of write-in ballots. But Miller concedes that other states use the same standard for counting write-in ballots and that Congress has mandated that standard. We see no basis for Miller to argue that the application of the standard in this election violates equal protection under either the state or federal constitution. First, only one person, the Division's Director, made the initial determinations whether write-in ballots demonstrated voter intent for a particular candidate; this avoids any constitutional infirmities that might arise from different reviewers applying the standard differently.[18] Second, the initial election results are subject to the Director's review during a recount.[19] And, of course, the Director's final determinations are subject to judicial review.[20]

We affirm the decision of the superior court on this issue.

**IV. The Manual Count Of Write–In Votes Complied With Alaska Law And Did Not Violate Miller's Right To Equal Protection.**

Miller alleges that the Division's procedure to manually count the write-in votes violated 6 AAC 25.085. He argues that this regulation requires the Division to manually examine and count only the write-in ballots the optical scanners had first validated. Miller claims that his interpretation of 6 AAC 25.085 would best "facilitate fairness" under AS 15.15.030.

Neither this regulation nor the statute Miller cites requires a particular procedure for counting write-in votes. Alaska Statute 15.15.030 addresses ballot preparation. It directs that ballots must be prepared "to facilitate fairness, simplicity, and clarity in the voting procedure"; it does not apply to the method used to conduct a count of write-in votes. In addition, Miller's contention that the Division should have manually counted only those write-in ballots that were first validated by the optical scanner ignores the State's uncontested showing that the optical scanner neither sorts nor segregates ballots. The machine merely counts filled-in ovals indicating a vote for those candidates whose names appear on pre-printed ballots and for the "write-in" category. It is possible to quantify the number of ballots that an optical scanner deems invalid, but these ballots are not segregated by the machine. Because the optical scanner counted a sufficient number of ballots for the "write-in" category in this election, it was necessary for the Division to conduct a manual count of the write-in ballots to determine for which candidates the write-in ballots had been cast.[21]

Miller impliedly raises an equal protection argument under *Bush v. Gore*,[22] claiming

**15.** 42 U.S.C. § 1973ff–2(c)(3) (2006).

**16.** *See* 6 Alaska Administrative Code (AAC) 25.670(b) (2010) ("Any abbreviation, misspelling, or other minor variation in the form of the name of a candidate or political party will be disregarded in determining the validity of the ballot, if the intention of the voter can be ascertained."). We do not reach the question as to whether any provisions of federal law might conflict with relevant portions of the Alaska Administrative Code, as it is not presented here.

**17.** *Cf. Bush,* 531 U.S. at 104–09, 121 S.Ct. 525.

**18.** *Cf. id.*

**19.** *See* AS 15.20.480.

**20.** *See* AS 15.20.510.

**21.** *See* 6 AAC 25.085(b).

**22.** 531 U.S. at 104–10, 121 S.Ct. 525.

that Division workers counted more write-in ballots than the optical scanner because they used a more lenient standard than the scanner.[23] But there is no factual dispute that the Division workers looked at every ballot cast in the election to segregate the total ballots cast for "write-in" candidates. In an affidavit to the superior court, Division Director Gail Fenumiai explained the three-step procedure as follows. First, "all the ballots cast in the election were sorted by 30 election board workers who worked in 15 teams of two." They sorted the ballots into five categories:

(1) ballots on which the oval was marked correctly next to a candidate's name that was printed on the ballot;

(2) ballots on which no oval was marked for U.S. Senate, more than one oval was marked for that race, or a name was written in but the oval was unmarked;

(3) ballots on which the write-in oval was marked and the written name was "Lisa Murkowski" or "Murkowski," spelled correctly, and the ballot was not challenged by any observer;

(4) ballots on which the write-in oval was marked and the name written appeared to be a variation or misspelling of Lisa Murkowski or Murkowski; this category also included any ballot challenged by an observer in the sorting process;

(5) ballots on which the write-in oval was marked and the name written in was not "Murkowski," "Lisa Murkowski," or a variation thereof.

Significantly, the candidates had observers present who could challenge the category into which every ballot was sorted. The Division instructed the workers who conducted the initial sort of the ballots not to proceed unless observers were present at the table from both the Miller and Murkowski campaigns.

After the ballots were sorted, the Director personally examined the ballots in category four—ballots on which ovals had been filled in but the handwritten name was a variation or misspelling of "Lisa Murkowski" and other ballots challenged during the sorting process—to determine voter intent.[24] The Director examined the ballots that were challenged because they contained misspellings of "Lisa Murkowski" or for any other reason. She permitted write-in ballots containing "minor misspellings and phonetic variations of 'Murkowski' to be counted for Lisa Murkowski when [she] determined that the voter clearly intended to vote for that candidate." The Director placed the ballots into one of two envelopes: "challenged counted" or "challenged not counted." If the Director's decision regarding voter intent was not challenged, the ballot was placed in category three (write-in, oval filled, Lisa Murkowski properly spelled, not challenged) or category five (write-in, oval filled, a candidate other than Murkowski), depending on whether the Director decided to count it for Murkowski.

The Director examined ballots in category two in which no oval was filled in for the U.S. Senate race, and those ballots were not counted for any candidate. This was true of ballots on which voters spelled "Lisa Murkowski" correctly but failed to fill in the oval. The Director also examined "over-voted ballots"[25] in category two to determine voter intent. As Director Fenumiai explained:

1) I did not count ballots that had no oval filled in for the U.S. Senate race, even if a name was written in.

2) If a ballot had two ovals filled in for the U.S. Senate race, I examined the ballot to see where the ovals appeared. If the voter had filled in the oval by the name of a candidate printed on the ballot and also by the write-in choice, I counted the ballot if

---

**23.** The optical scanner detected 102,252 write-in votes. From all of the ballots cast in the election, the Division workers manually sorted out 103,805 ballots cast for a "write-in" candidate. From that total, the Division determined that 101,088 ballots were cast for Lisa Murkowski; 92,929 were unchallenged and 8,159 were challenged but counted.

**24.** The Director was the only person who made the final decision regarding voter intent. Given this protocol, we see no basis for any concern that inconsistent standards were used to determine the validity of ballots cast in this election.

**25.** This refers to a ballot with more than one oval filled in.

the voter wrote in the name of the same candidate. This is how Joe Miller received many of his 20 write-in votes. I also counted ballots with two ovals marked when it was clear that the voter crossed out one of the ovals. I did this regardless of whether the voter expresses an intent to vote for a write-in candidate or for a candidate whose name was printed on the ballot. Otherwise, I did not add the ballot to the count.

3) The candidates' observers were able to challenge all of these determinations.

As a result of this process, each candidate's vote tally was increased. The write-in vote count yielded the following tallies:

| | |
|---|---:|
| Lisa Murkowski, unchallenged | 92,929 |
| Lisa Murkowski, challenged, counted | 8,159 |
| Total counted for Lisa Murkowski | 101,088 |
| | |
| Lisa Murkowski, challenged, not counted | 2,016 |
| Joe Miller | 20 |
| Scott McAdams | 8 |
| Other registered write-in candidates | 53 |
| Other miscellaneous names | 620 |
| | |
| Total write-in votes | 103,805 |

The total number of write-in votes identified by the Division workers was 103,805 but the optical scanner detected 102,252. Miller claims that because the total write-in votes from the manual count—103,805—was higher than the number of write-in votes detected by the optical scanner, the workers must have applied "more lenient standards" that unfairly advantaged Murkowski. He claims that "it is unclear how many additional votes Joe Miller, or any other preprinted candidate, would have gained, had those same standards been applied to all the ballots in the election." But having carefully examined the record in this case, we conclude that the

record does not support Miller's contention that ballots in category two were treated differently depending on whether they were cast for candidates whose names were pre-printed on the ballot. Observers working on Miller's behalf had the opportunity to challenge the sorting of every ballot cast in the election, and every category-two ballot was individually examined, as were the ballots in category four.[26] In addition, only one individual—the Director of the Division—looked at all of the ballots containing anomalies, including both over-votes and under-votes. We fail to see how having one person examine all overcount, undercount, and write-in ballots and all ballots challenged by either candidate is not a uniform standard. Finally, the Director's examination resulted in additional votes for both Miller and Democratic nominee Scott McAdams, as well as Murkowski. Because the Division applied the methodology described above to every precinct, we conclude that the Division's methodology gave all of the ballots—as well as all of the candidates—equal treatment.

For these reasons, we affirm the decision of the superior court on this issue.

## V. The Division's Vote–Counting Procedures Are Not Regulations.

■ Miller argues that the Division's write-in vote-counting methodology is a regulation, or set of regulations, that should have been enacted pursuant to the Administrative Procedure Act (APA).[27] We disagree.

■ The APA requires advance notice of a regulation before it can be applied in agency interactions with the public.[28] Common sense statutory interpretations by agencies do not require regulations.[29] By

---

**26.** We observe that even if Miller had demonstrated that the Division was more lenient in the threshold it used to validate votes than the optical scanner, the difference he cites would not have changed the outcome of this election.

The optical scanners deemed a total of 2,882 votes for the U.S. Senate race to be invalid. But the Division shows that the number of votes rejected by the optical scanner that could have been cast in Miller's favor is much smaller. The Division begins with the total number of ballots cast in this election (258,746) and subtracts the total number of votes cast for candidates on the pre-printed ballot (153,579) and the total number

of write-in votes it identified in its manual tally (103,805). The difference (258,746–257,384 = 1,362) is the Division's calculation of the number of votes rejected by the scanners that could have been cast in Miller's favor.

**27.** AS 44.62.010 *et seq.*

**28.** AS 44.62.190.

**29.** *See Squires v. Alaska Bd. of Architects, Eng'rs & Land Surveyors,* 205 P.3d 326, 334–35 (Alaska 2009); *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation,* 145 P.3d 561, 573 (Alaska

874

contrast, if a statutory interpretation is "expansive or unforeseeable," the agency may be required to promulgate its interpretation through a regulation.[30] The Division's statutory interpretations of AS 15.15.360 and 6 AAC 25.085 were common sense interpretations and were not required to be promulgated in regulations. We have previously noted that "[n]early every agency action is based, implicitly or explicitly, on an interpretation of a statute or regulation authorizing it to act. A requirement that each such interpretation be preceded by rulemaking would result in complete ossification of the regulatory state."[31] We decline to depart from our previous decisions, and conclude that the Division did not violate the APA. Accordingly, we affirm the decision of the superior court on this issue.

## VI. We Affirm The Dismissal Of Miller's Claims For Invalidation Of Two Categories Of Votes: (1) Votes Allegedly Cast By Voters Whose Identities Had Not Been Confirmed, And (2) Write-In Votes Allegedly Cast By The Same Person(s) On Multiple Ballots.

### A. Overview

This case comes to us under unusual circumstances. The election was held on November 2, 2010. Without seeking a statutorily available vote recount by the Division[32] or filing a lawsuit in state court to contest the election,[33] on November 9 Miller filed a federal court lawsuit. Miller sought declaratory and injunctive relief (1) stopping the Division from certifying the election results in favor of Murkowski, and (2) directing the Division to follow his interpretation of AS 15.15.360 by invalidating write-in votes "in which a candidate's name is misspelled or is not written on the ballot as it appears on the candidate's write-in declaration of candidacy." On No-

vember 19 the federal court issued an injunction against certification, conditioned on Miller's filing a state court lawsuit by November 22 to resolve the disputed interpretation of AS 15.15.360.

Miller filed suit in superior court on November 22, seeking not only declaratory and injunctive relief regarding the interpretation of AS 15.15.360, but also regarding: alleged disparate treatment of ballots, violation of other election statutes, the validity of the Division's write-in vote-counting methodology under the Administrative Procedure Act, the validity of classes of votes the Division counted, and the validity of the election results. Murkowski intervened in Miller's lawsuit, asking for declaratory and injunctive relief regarding the interpretation of election statutes, as well as challenging the validity of two classes of votes not counted by the Division. After expediting the proceedings, on December 10, 2010, Superior Court Judge William B. Carey upheld all of the Division's disputed actions, treating some claims as pure declaratory judgment requests and treating other claims as an election contest under AS 15.20.540.

It may be that certain legal issues could properly be brought to us pre-election or during an election with appropriate requests for declaratory and even injunctive relief. But the legislature has created two specific legal proceedings for election challenges that would normally apply to many of the issues in this case—an election contest and a recount appeal.[34] And as we have noted, "an election contest and a recount appeal are distinct proceedings."[35]

An election contest is authorized by AS 15.20.540, which provides that "a contest of the election as a whole" is heard first by the superior court.[36] An election contestant

2006); *Alaska Ctr. for the Env't v. State, Office of the Governor, Office of Mgmt. & Budget, Div. of Gov't Coordination,* 80 P.3d 231, 243–44 (Alaska 2003).

30. *Alyeska Pipeline,* 145 P.3d at 573.

31. *Id.*

32. *See* AS 15.20.430–.530.

33. *See* AS 15.20.540–.560.

34. *See Willis v. Thomas,* 600 P.2d 1079, 1081 (Alaska 1979) (identifying, describing, and comparing the two legal proceedings).

35. *Id.*

36. *Id.; see also* AS 15.20.550 (providing for superior court's original jurisdiction).

must show "malconduct, fraud, or corruption on the part of an election official sufficient to change the result of the election" or "any corrupt practice as defined by law sufficient to change the results of the election." [37]

By contrast, AS 15.20.510 provides for a recount appeal directly to our court to challenge the Director's decisions to count or not count votes during a recount of an election for, among other offices, the United States Senate.[38] We have noted that "the inquiry in a recount appeal is whether specific votes or classes of votes were properly counted or rejected." [39] Our review comes only after the Director "review[s] all ballots ... to determine which ballots, or part of ballots, were properly marked and which ballots are to be counted in the recount[.]" [40] Issues we have considered in a recount appeal "include the validity of punch cards and a variety of marks on ballots, the proper procedures for absentee voting and consequences for failure to follow those procedures, and registration requirements." [41]

With this legal framework in mind, we consider Miller's claims that two classes of votes should not be counted.

### B. Multiple write-in ballots cast by the same person(s)

█ Miller alleged in his complaint that the Division accepted and counted as valid "write-in votes in which the candidate's name apparently was not written on the ballot by the voter" in violation of AS 15.15.360(a)(10), which provides that "the voter" must write in the candidate's name. In its summary judgment motion,[42] the State noted that under AS 15.15.240 voters "can delegate that authority [to vote] to others—election officials or friends or family members—if they need assistance in writing in the name of a candidate." [43] The State argued that Miller's claim was in the nature of an election contest and that he would have to present some evidence of both (1) improper conduct on the part of someone and (2) an indication that any such wrongful conduct was sufficient to affect the election's outcome.

Miller submitted affidavits from observers of the ballot count attesting that in some precincts many write-in ballots appeared to have been written in similar handwriting. He argued that this evidence was "sufficiently suspicious that it legitimately raises the specter of voter fraud or other electoral improprieties." (This argument reflects that he considered his claim to be an election contest claim under AS 15.20.540, because misconduct is not an element of a recount appeal.[44]) He also argued that this evidence was sufficient to entitle him to further time for discovery regarding the identity of the people who completed the ballots, whether voters had actually requested assistance, why only a few people apparently filled in many ballots, and the total number of ballots that might have been affected.[45]

---

37. AS 15.20.540.

38. AS 15.20.510 provides, in relevant part: "A candidate ... who requested a recount who has reason to believe an error has been made in the recount ... involving candidates for ... Congress ... may appeal to the supreme court...."

39. *Willis*, 600 P.2d at 1081.

40. AS 15.20.480.

41. *Cissna v. Stout*, 931 P.2d 363, 367 (Alaska 1996). Miller's claim for declaratory judgment regarding the interpretation of AS 15.15.360 can easily be seen as in the nature of a recount appeal that should not be properly before us. Given the unusual circumstances of this case, we nonetheless chose to decide the legal issues raised regarding Alaska election statutes and regulations.

42. Under Alaska Civil Rule 56(c), summary judgment may be granted without trial if there are no genuine issues of fact and a party is entitled to judgment as a matter of law.

43. AS 15.15.240 provides, in relevant part, that "[a] qualified voter needing assistance in voting may request an election official, a person, or not more than two persons of the voter's choice to assist."

44. *Willis*, 600 P.2d at 1081 ("[I]n a recount appeal ... [t]he concept of malconduct does not enter into the question[.]").

45. Alaska Civil Rule 56(f) allows the superior court broad discretion to grant a party sufficient time to conduct discovery before opposing a summary judgment motion if the party is unable to marshal evidence in the time normally required to oppose the motion.

The superior court denied Miller's request for discovery and granted the State's motion for summary judgment, noting that the admissible portions of Miller's evidence did not create a genuine issue of material fact regarding misconduct by anyone, and that it was not even sufficient circumstantial evidence to warrant discovery before opposing the summary judgment motion. We agree.

Alaska Statute 15.15.240 allows any qualified voter to ask for assistance, including assistance in writing in the name of a write-in candidate. No reasonable inference of misconduct can arise from the mere fact that the handwriting on multiple ballots appears to be from a small number of people. And though we have interpreted Civil Rule 56(f) liberally to allow a litigant a meaningful opportunity to obtain evidence to present a case,[46] pure speculation cannot support a fishing expedition for evidence to oppose summary judgment in an election contest. We affirm the superior court's summary dismissal of this election contest claim.

### C. Ballots cast by allegedly unidentified voters

■ Miller alleged in his complaint that the Division accepted and counted as valid ballots from voters who, "according to the official election registers from the precinct polling places, ... neither showed proper identification nor were excused from showing such identification." He noted that Alaska law requires a voter to show identification before being allowed to vote, unless an election official waives that requirement because the voter is known to the official.[47]

In its motion for summary judgment, the State explained that although the voter registers contain spaces for election officials to specify how they verified each voter's identity, there is no statutory or regulatory requirement that the election officials actually fill in this information. Construing Miller's claim as an election contest, the State argued that Miller would have to produce some evi-

dence both (1) that misconduct by election officials actually allowed unregistered persons to vote and (2) that the number of votes in question would affect the outcome of the election. Miller responded that he was not bringing an election contest on this issue, but rather was "contesting the validity of particular ballots." He argued that the failure of election officials to mark the register form for some voters was circumstantial evidence that "certain people may have voted without showing identification or being personally known to an election worker" and that he needed discovery to determine who they were.

The superior court treated this claim as an election contest, denied Miller's request for discovery, and granted summary judgment in favor of the State. The court noted that there is no requirement that election workers fill out the register, that the failure to fill out the register did not create a reasonable inference of misconduct by election officials, and that there was no legitimate basis for the requested discovery based solely on the failure to fill out some of the registers.

But Miller did not raise his claim as an election contest within the jurisdiction of the superior court. He instead raised a challenge to "the validity of particular ballots," which is in the nature of a recount appeal that would come directly to us. But he also did not ask for a recount and there is no recount decision about the validity of particular ballots for us to review. Miller cannot avoid the avenues established by the legislature to challenge elections: Miller asserted in the superior court that he did not bring an election contest, and he did not seek a recount by the Division. The only possible issue before us, then, is an issue not decided by the superior court: whether Miller is entitled to a judgment declaring that an entire class of ballots—those from voters for whom election officials did not mark on their registers how the officials verified the voters' identification—is invalid. He is not entitled

---

46. *E.g., Kessey v. Frontier Lodge, Inc.*, 42 P.3d 1060, 1062 (Alaska 2002) ("Generally, 'requests made pursuant to Rule 56(f) should be freely granted[.]' " (quoting *Jennings v. State*, 566 P.2d 1304, 1313 (Alaska 1997))); *Gamble v. Northstore*

*P'ship*, 907 P.2d 477, 485 (Alaska 1995); *Munn v. Bristol Bay Hous. Auth.*, 777 P.2d 188, 193 (Alaska 1989).

47. *See* AS 15.15.225.

to such a judgment. We affirm the superior court's dismissal of the claim because there is no legal requirement that an election official mark the register form for identification verification and the failure to do so does not invalidate a vote.

## VII. We Do Not Reach Questions Regarding Miller's Motion To Amend His Complaint To Add Claims About Alleged Voting By Felons.

During the summary judgment briefing, Miller raised a new claim that an unknown number of felons ineligible to vote had actually voted in the election. This claim was discussed at oral argument before the superior court on the summary judgment issues. Shortly after the oral argument, Miller sought leave to file an amended complaint setting out this claim. The superior court issued its order on summary judgment without ruling on the motion to amend. In light of the expedited nature of this case, we accepted Miller's appeal of the summary judgment ruling without waiting for a final judgment from the superior court.

We now decline to reach whether the superior court implicitly denied the motion to amend and whether it was error to do so. We will resolve all issues actually before us by way of this opinion, and we will return jurisdiction to the superior court to consider Miller's motion to amend. But we note the following.

If Miller intends to pursue his superior court claim about improper voting by felons, he must do so as an election contest under AS 15.20.540. He must allege and prove the necessary elements of an election contest claim, including the level of misconduct necessary to support the claim and that the votes in question are sufficient to change the result of the election. In light of our other rulings and the current voting tally, it appears to us that the number of votes in question would have to be in the tens of thousands to change the result of the election.[48] But it is difficult, at best, to quantify the number based on the record before us, and we leave that to the parties to resolve in the superior court should Miller decide to pursue this claim.

Finally, we note that an election contest does not bar certification of an election and that there are no remaining issues raised by Miller that would prevent this election from being certified. Under AS 15.20.560, if an election contest ultimately changes the result of an election, judgment will be so entered and a new certification will be issued.[49]

## VIII. The Superior Court Did Not Err In Denying Murkowski's Motion for Summary Judgment On Her Claim That Write–In Ballots With Her Name But Lacking A Filled–In Oval Should Have Been Counted.

The Division did not count a number of ballots for Murkowski because the voters had not filled in the ovals next to the write-in line, even though the voters had written in Murkowski's name. Murkowski argues that these votes should have been counted for her.[50] We disagree. Alaska Statute 15.15.360(a)(10) states that "[i]n order to vote for a write-in candidate, the voter must write in the candidate's name in the space provided *and* fill in the oval opposite the candidate's name." (Emphasis added.) Although AS 15.15.360(a) does not address spelling, marks that validly "fill in the oval" are subject to the requirements of AS 15.15.360(a)(1) and (a)(5), which state:

48. Miller currently trails by over 10,000 votes. Because any malconduct in allowing ineligible felons to vote would not appear to bias any particular candidate, proportional reduction of votes would be the proper remedy if any ineligible felons were actually shown to have voted. *See Hammond v. Hickel,* 588 P.2d 256, 260 (Alaska 1978).

49. AS 15.20.560 provides in relevant part that, at the conclusion of an election contest, "[t]he judge shall pronounce judgment on which candi-

date was elected.... The director shall issue a new election certificate to correctly reflect the judgment of the court."

50. Like Miller's claim regarding the class of votes by allegedly unidentified voters, this claim is in the nature of an election recount appeal. Like Miller, Murkowski did not request a recount. We therefore consider this claim only as one for declaratory judgment with respect to the interpretation of AS 15.15.360's provisions regarding marking the ovals on ballots.

(1) A voter may mark a ballot only by filling in, making "X" marks, diagonal, horizontal, or vertical marks, solid marks, stars, circles, asterisks, checks, or plus signs that are clearly spaced in the oval opposite the name of the candidate, proposition, or question that the voter desires to designate.

. . . .

(5) The mark specified in (1) of this subsection shall be counted only if it is substantially inside the oval provided, or touching the oval so as to indicate clearly that the voter intended the particular oval to be designated.

In other words, the statute mandates that the write-in voter mark the oval in some fashion; a blank oval will invalidate the vote. Writing in the name but not marking the oval is not compliant with the statute. Murkowski is not entitled to declaratory judg-

ment that AS 15.15.360 should be interpreted to excuse write-in voters from marking ovals as required by law.[51] Accordingly, we affirm the decision of the superior court on this issue.

## IX. Conclusion

For the reasons set out above, we AFFIRM the decision of the superior court in all respects. There are no remaining issues raised by Miller that prevent this election from being certified.

STOWERS, Justice, not participating.

---

**51.** Murkowski also argues that the Division erred by not counting a number of write-in votes for "Lisa M." and that the superior court erred by affirming the Division's determination. This claim is essentially a recount appeal that may only be brought to us after a recount by the Director, and is not an election contest within the jurisdiction of the superior court. As with Miller's claim about specific votes by allegedly unidentified voters, Murkowski's claim is not properly before us. To the extent she requests declaratory judgment regarding variations on write-in candidates' names, we have already addressed it.